1
2
3
4
5

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

6
7

**Attorneys for Plaintiff**
*- additional counsel on signature page –*

8
9
10
11

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20
21

SHIVA STEIN, Individually and On
Behalf of All Others Similarly
Situated,

                     Plaintiff,

        v.

BRIDGEPOINT EDUCATION, INC.,
ANDREW S. CLARK, KEVIN
ROYAL, and JOSEPH L. D'AMICO,

              Defendants.

**Case No.**  '19 CV 0460 WQH MSB

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

22
23
24
25
26
27
28

      Plaintiff Shiva Stein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included,

among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bridgepoint Education, Inc. ("Bridgepoint" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Bridgepoint securities between March 8, 2016 and March 7, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Bridgepoint was founded in 1999 and is headquartered in San Diego, California. Bridgepoint, together with its subsidiaries, provides postsecondary education services in the United States. The Company was formerly known as TeleUniversity, Inc. and changed its name to Bridgepoint Education, Inc. in February 2004.

3. Bridgepoint's academic institutions, Ashford University and University of the Rockies, offer associate's, bachelor's, master's, and doctoral degree programs in the

disciplines of business, education, psychology, social sciences, and health sciences. Bridgepoint offers its programs primarily through online, and also at its campuses.  As of December 31, 2017, its institutions offered approximately 1,200 courses and 80 degree programs, with 45,730 students enrolled.

4.     As a means of increasing enrollment, the Company formed various corporate partnerships with employers to offer their employees a way to pursue and complete a college degree without incurring any student debt, referred to as the Corporate Full Tuition Grant ("FTG") program.  In 2017, enrollments in the Company's FTG program accounted for approximately 10% of its total enrollment.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Bridgepoint's processes for recording revenue for its FTG program were inaccurate; (ii) Bridgepoint maintained deficient internal controls; (iii) due to the foregoing deficiencies, Bridgepoint was prone to and did commit material accounting errors related to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses; and (iv) as a result, Bridgepoint's public statements were materially false and misleading at all relevant times.

6.     On March 7, 2019, Bridgepoint announced that it had "determined to restate the Company's previously issued unaudited condensed consolidated financial statements,

and advised that those financial statements should not be relied upon, for the three and nine months ended September 30, 2018." Bridgepoint stated that the processes used for recording revenue for the FTG program portion of its student contracts "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses. Bridgepoint also identified weaknesses in internal controls.

7.     On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and § 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business in this

District, maintain their principal place of business in this District, and a significant portion of Defendants' actions and the subsequent damages took place within this District.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

13.    Plaintiff, as set forth in the attached Certification, acquired Bridgepoint securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Defendant Bridgepoint is a Delaware corporation with its principal executive offices located at 8620 Spectrum Center Blvd, San Diego, California. Bridgepoint securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BPI."

15.    Defendant Andrew S. Clark ("Clark") has served as Bridgepoint's President and Chief Executive Officer ("CEO") at all relevant times.

16.    Defendant Kevin Royal ("Royal") has served as Bridgepoint's Chief Financial Officer ("CFO") since April 16, 2018.  Royal also served as the CFO of Bridgepoint from October 1, 2015 until October 13, 2017

17.    Defendant Joseph L. D'Amico ("D'Amico") served as Bridgepoint's Interim CFO from October 16, 2017 until April 16, 2018.

18.    Defendants Clark, Royal, and D'Amico are sometimes referred to herein collectively as the "Individual Defendants."

19.    The Individual Defendants possessed the power and authority to control the contents of Bridgepoint's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Bridgepoint's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Bridgepoint, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    Bridgepoint was founded in 1999 and is headquartered in San Diego, California. Bridgepoint, together with its subsidiaries, provides postsecondary education services in the United States. The Company was formerly known as TeleUniversity, Inc. and changed its name to Bridgepoint Education, Inc. in February 2004.

6

21.     Bridgepoint's academic institutions, Ashford University and University of the Rockies, offer associate's, bachelor's, master's, and doctoral degree programs in the disciplines of business, education, psychology, social sciences, and health sciences. Bridgepoint offers its programs primarily through online, and also at its campuses.  As of December 31, 2017, its institutions offered approximately 1,200 courses and 80 degree programs, with 45,730 students enrolled.

22.     As a means of increasing enrollment, the Company formed various corporate partnerships with employers to offer their employees a way to pursue and complete a college degree without incurring any student debt, referred to as the Corporate Full Tuition Grant program.  In 2017, enrollments in the Company's FTG program accounted for approximately 10% of its total enrollment.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on March 8, 2016, when Bridgepoint filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K").  For 2015, Bridgepoint reported a net loss of $70.45 million, or $1.54 per diluted share, on net revenue of $561.73 million, compared to net income of $9.67 million, or $0.21 per diluted share, on net revenue of $638.71 million for 2014.  Additionally, the 2015 10-K reported a provision for bad debts of $29.86 million, accounts receivable of $34.21 million with net accounts receivable of $24.09 million (less allowance for doubtful

accounts of $10.11 million), deferred revenue of $23.31 million, and total costs and expenses of $604.02 million.

24.     Appended as an exhibit to the 2015 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), in which Defendants Clark and Royal certified that the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

25.     On March 7, 2017, Bridgepoint filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 10-K").  For 2016, Bridgepoint reported a net loss of $30.04 million, or $0.65 per diluted share, on net revenue of $527.09 million, compared to a net loss of $70.45 million, or $1.54 per diluted share, on net revenue of $561.73 million for 2015.  Additionally, the 2016 10-K reported a provision for bad debts of $32.58 million, accounts receivable of $42.61 million with net accounts receivable of $26.46 million (less allowance for doubtful accounts of $16.15 million), deferred revenue of $21.73 million, and total costs and expenses of $567.31 million.

26.     The 2016 10-K also represented that Bridgepoint's disclosure controls and procedures, as well as internal control over financial reporting, were effective, stating, in relevant part:

We maintain disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) under the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

Under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer, we carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15(b) and Rule 15d-15(b) of the Exchange Act. Based on this evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2016.

\* \* \*

Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements prepared for external purposes in accordance with GAAP.

\* \* \*

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 based on the framework set forth in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

27.     The 2016 10-K also contained merely generic, boilerplate representations with respect to Bridgepoint's risk of error relating to its disclosure controls and procedures, as well as internal control over financial reporting, stating, in relevant part:

> In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of any possible controls and procedures.
>
> * * *
>
> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of the effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

28.     Appended as an exhibit to the 2016 10-K were signed SOX certifications, in which Defendants Clark and Royal certified that the 2016 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On February 21, 2018, Bridgepoint filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 10-K"). For 2017, Bridgepoint reported net income of $10.54 million, or $0.32 per diluted share, on net revenue of $478.40 million, compared to a net loss of $30.04 million, or $0.65 per diluted share, on net revenue of

$527.09 million for 2016. Additionally, the 2017 10-K reported a provision for bad debts of $32.15 million, accounts receivable of $44.66 million with net accounts receivable of $27.078 million (less allowance for doubtful accounts of $17.58 million), deferred revenue of $19.14 million, and total costs and expenses of $470.55 million.

30.    The 2017 10-K also discussed Bridgepoint's FTG program and touted its contribution to Bridgepoint's total enrollment, stating, in relevant part:

> One area in which we are experiencing positive enrollment trends is within our Education Partnerships programs with various employers. These corporate partnership programs provide companies with the opportunity to offer their employees a way to pursue and complete a college degree without incurring any student debt. Enrollments in the Corporate Full Tuition Grant ('FTG') program is approximately 10% of our total enrollment as of December 31, 2017, compared to approximately 6% of our total enrollment as of December 31, 2016. Revenue derived from Education Partnerships is cash pay, and is therefore not considered federal student aid for purposes of calculations under the 90/10 rule.

* * *

> Certain scholarships, such as the Corporate Full Tuition Grant ('FTG') and Alumni Scholarship are recognized against revenue over the period of benefit to the student.

31.    With respect to the effectiveness of Bridgepoint's disclosure controls and procedures, as well as internal control over financial reporting, the 2017 10-K contained statements substantively identical to the statements in the 2016 10-K referenced in ¶ 26 above.

32.    Likewise, the 2017 10-K contained general and boilerplate representations concerning Bridgepoint's risk of error relating to its disclosure controls and procedures,

as well as internal control over financial reporting, substantively identical to the statements in the Company's 2016 10-K referenced in ¶ 27 above.

33.   Appended as an exhibit to the 2017 10-K were signed SOX certifications, in which Defendants Clark and D'Amico certified that the 2017 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

34.   On May 1, 2018, Bridgepoint filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q reported net income of $2.30 million, or $0.08 per diluted share, on net revenue of $118.03 million for the quarter, compared to net income of $9.87 million, or $0.23 per diluted share, on net revenue of $129.49 million for the same quarter 2017. Additionally, the 1Q18 10-Q reported a provision for bad debts of $6.65 million, accounts receivable of $47.02 million with net accounts receivable of $33.59 million (less allowance for doubtful accounts of $13.43 million), deferred revenue of $22.97 million, and total costs and expenses of $117.65 million.

35.   Appended as an exhibit to the 1Q18 10-Q were signed SOX certifications, in which Defendants Clark and Royal certified that the 1Q18 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as

amended" and that "[t]he information contained in the [1Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

36.     On July 25, 2018, Bridgepoint filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q").  The 2Q18 10-Q reported net income of $17.23 million, or $0.63 per diluted share, on net revenue of $120.83 million for the quarter, compared to net income of $6.31 million, or $0.21 per diluted share, on net revenue of $124.58 million for the same quarter 2017.  Additionally, the 2Q18 10-Q reported a provision for bad debts of $11.71 million, accounts receivable of $48.57 million with net accounts receivable of $34.06 million (less allowance for doubtful accounts of $14.51 million), deferred revenue of $20.26 million, and total costs and expenses of $109.28 million.

37.     Appended as an exhibit to the 2Q18 10-Q were signed SOX certifications, in which Defendants Clark and Royal certified that the 2Q18 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

38.     On November 8, 2018, Bridgepoint filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q").  The 3Q18 10-Q reported net income of $4.31 million, or $0.16 per diluted share, on net revenue of $114.86 million

for the quarter, compared to net income of $39.00 thousand, or $0.00 per diluted share, on net revenue of $119.37 million for the same quarter 2017.  Additionally, the 3Q18 10-Q reported a provision for bad debts of $18.54 million, accounts receivable of $49.23 million with net accounts receivable of $33.57 million (less allowance for doubtful accounts of $15.67 million), deferred revenue of $17.86 million, and total costs and expenses of $111.33 million.

39.     Appended as an exhibit to the 3Q18 10-Q were signed SOX certifications, in which Defendants Clark and Royal certified that the 3Q18 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

40.     The statements referenced in ¶¶ 23-39 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Bridgepoint's processes for recording revenue for its FTG program were inaccurate; (ii) Bridgepoint maintained deficient internal controls; (iii) due to the foregoing deficiencies, Bridgepoint was prone to and did commit material accounting errors related to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses; and (iv)

as a result, Bridgepoint's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

41.    On March 7, 2019, Bridgepoint filed a current report on Form 8-K with the SEC (the "2019 8-K"), announcing that it had "determined to restate the Company's previously issued unaudited condensed consolidated financial statements, and advised that those financial statements should not be relied upon, for the three and nine months ended September 30, 2018." Bridgepoint stated that the processes used for recording revenue for the FTG program portion of its student contracts "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses. Bridgepoint also identified weaknesses in internal controls.

42.    Specifically, the 2019 8-K stated, in relevant part:

On March 6, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of Bridgepoint Education, Inc. (the "Company") concluded that the Company's previously issued unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2018 (the "Restated Periods"), should no longer be relied upon because of errors. Additionally, the Company's earnings and press releases and similar communications to the extent that they relate to our financial statements for the Restated Periods should no longer be relied upon.

Specifically, during the preparation of the 2018 annual consolidated financial statements, the Company determined that the process used for recording the revenue for the Full Tuition Grant program portion of our

student contracts and the related judgments and estimates were not designed with sufficient precision. As a result, the Company identified errors, relating to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses for the Restated Periods. The errors described above were material to the Restated Periods and will be corrected in the restatement of our financial statements for the Restated Periods.

The Company plans to restate its unaudited condensed consolidated financial statements for the Restated Periods discussed above by filing an amended Form 10-Q for the period ended September 30, 2018 (the "Amended Form 10-Q"). As similar errors described above existed in earlier periods, but were not considered material, the Company plans to reflect the correction of such immaterial errors for the years ended December 31, 2016 and 2017 (and related quarterly periods therein), as well as the first and second quarters of 2018 (the "Revised Periods"), in the Amended Form 10-Q and prospectively as it issues subsequent filings. Adjustments prior to December 31, 2015 will be adjusted through the retained earnings balance as of January 1, 2016, as the adjustments in those periods were not considered material.

In addition, the Company has subsequently identified two material weaknesses in internal control over financial reporting related to 1) control design in the accounting for revenue related to the Full Tuition Grant program and 2) operation of review controls over unusual or non-recurring and significant transactions.

Our management has re-evaluated its assessment of our disclosure controls and procedures and internal control over financial reporting as of September 30, 2018 and concluded that each was ineffective as of that date due to the existence of the material weaknesses. As part of our Amended Form 10-Q, we will update and reflect the restatement of our financial statements for the Restated Periods and the change in management's conclusion regarding the effectiveness of our disclosure controls and procedures and internal control over financial reporting as of September 30, 2018. As a result, we will not file our Form 10-K for the year ended December 31, 2018 (the "Form 10-K") until after the filing of the Amended Form 10-Q.

We expect that certain amounts in the condensed consolidated financial statements for the Restated Periods, which will be included in the Amended Form 10-Q, to differ from the amounts reported in the original filing. Revenue, as restated, for the nine month period ended September 30, 2018 is

expected to be in a range of approximately $347.2 million to $348.7 million. Net income, as restated, for the nine month period ended September 30, 2018 is expected to be in a range of approximately $17.6 million to $18.1 million. However, the restatement effects discussed herein are preliminary and subject to further assessment prior to the filing of the Amended Form 10-Q. We do not anticipate any material changes to our financial statements for the Revised Periods.

43.    On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume.

## **PLAINTIF'S FCLASS ACTION ALLEGATIONS**

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Bridgepoint securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bridgepoint securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and

other members of the Class may be identified from records maintained by Bridgepoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Bridgepoint;

- whether the Individual Defendants caused Bridgepoint to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Bridgepoint securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

50.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Bridgepoint  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Bridgepoint securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

19

52. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

53. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i)

20

deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bridgepoint securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Bridgepoint securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Bridgepoint securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Bridgepoint's finances and business prospects.

57.     By virtue of their positions at Bridgepoint, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of Defendants were committed

willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Bridgepoint, the Individual Defendants had knowledge of the details of Bridgepoint's internal affairs.

59.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Bridgepoint.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Bridgepoint's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Bridgepoint securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Bridgepoint's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Bridgepoint securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

60.     During the Class Period, Bridgepoint securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Bridgepoint securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Bridgepoint securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Bridgepoint securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

63.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of Bridgepoint, and conducted and participated, directly and indirectly, in the conduct of Bridgepoint's business affairs.  Because of their senior positions, they knew the adverse non-public information about Bridgepoint's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Bridgepoint's financial condition and results of operations, and to correct promptly any public statements issued by Bridgepoint which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Bridgepoint disseminated in the marketplace during the Class Period concerning Bridgepoint's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Bridgepoint to engage in the wrongful acts complained of herein.  The Individual

Defendants therefore, were "controlling persons" of Bridgepoint within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bridgepoint securities.

67.   Each of the Individual Defendants, therefore, acted as a controlling person of Bridgepoint.  By reason of their senior management positions and/or being directors of Bridgepoint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Bridgepoint to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Bridgepoint and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Bridgepoint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2019

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone:  (818) 532-6499
E-mail:  jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan D. Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com
E-mail: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Chicago, Illinois 60603
Telephone:   (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28