**POMERANTZ LLP**
Jennifer Pafiti
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone: 310-405-7190
Email: jpafiti@pomlaw.com

(*additional counsel on signature page*)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

SHIVA STEIN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BRIDGEPOINT EDUCATION, INC.;
ANDREW S. CLARK;
KEVIN ROYAL; and
JOSEPH L. D'AMICO,

Defendants.

Case No. 3:19-cv-460-WQH-MSB

**AMENDED CLASS ACTION COMPLAINT**

CLASS ACTION

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Jurisdiction and Venue ............................................................................................... 3

Parties ......................................................................................................................... 3

    Plaintiff ................................................................................................................. 3

    Defendants ............................................................................................................ 3

        Individual Defendants .................................................................................. 4

Relevant Accounting Standards .................................................................................. 6

    Accrual Accounting under GAAP ........................................................................ 8

    Revenue Recognition ......................................................................................... 10

        Accounting for Revenue before 2018 ........................................................ 15

        Accounting for Revenue beginning January 1, 2018 .................................. 17

        Accounting for the FTG Program ............................................................... 18

    Internal Controls ................................................................................................ 21

Factual Background ................................................................................................... 25

    Rapid Growth ..................................................................................................... 25

    Sharply Declining Enrollments Expose Bridgepoint to New Risks .................. 27

        Bridgepoint's Efforts to Remain Compliant with the "90/10" Rule .............. 28

        Bridgepoint's Increasing Reliance on the Full Tuition Grant ("FTG") Program ............ 29

    Bridgepoint Separates From its Accredited Institutions .................................... 33

Bridgepoint's Accounting During the Class Period ................................................... 34

    Government Investigations Force the Company to Restate its Financials Due to Revenue Recognition Problems .................................................................... 34

    Bridgepoint Takes Years Before Purporting to Fix its Material Weakness .......................... 39

    However, the Company Had Not In Fact Fixed its Internal Controls .................. 45

Defendants' False and Misleading Statements During the Class Period ..................... 46

    2015 10-K ........................................................................................................... 46

    2016 10-K ........................................................................................................... 47

    2017 10-K ........................................................................................................... 50

    2018 Q1 10-Q ..................................................................................................... 51

    2018 Q2 10-Q ..................................................................................................... 51

    2018 Q3 10-Q ..................................................................................................... 52

Why All These Statements Were Materially False and Misleading ........................................ 52

The Truth Begins to Emerge ............................................................................................... 53

The March 7, 2019 8-K and the Restatement ...................................................................... 53

The 2018 10-K ................................................................................................................... 56

Bridgepoint's Material Weakness in Internal Control and its Restatements ..................... 57

2016 and 2017 Restatements ............................................................................................. 60

Loss Causation ................................................................................................................... 62

Class Action Allegations .................................................................................................... 62

Count I ............................................................................................................................... 64

Count II .............................................................................................................................. 66

Prayer for Relief ................................................................................................................ 68

Jury Demand ...................................................................................................................... 68

Lead Plaintiff Shiva Stein, on behalf of herself and all others similarly situated, allege the following based upon personal knowledge as to its own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, inter alia, SEC filings by Bridgepoint Education, Inc. ("Bridgepoint" or the "Company"), press releases and other public statements by Defendants, conference calls and announcements made by Defendants, media and analyst reports and advisories about the Company, regulatory filings, other public information, and pertinent standards relating to the accounting issues at hand. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **Preliminary Statement**

1.      This is a federal securities class action, against the Company and certain of its directors and/or executive officers, on behalf of all persons who purchased or otherwise acquired the Company's securities between March 8, 2016 and March 12, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      During the Class Period, Defendants faced a precipitous decline in the Company's enrollments as well as tightening regulatory scrutiny, and began seeking drastic measures to reverse the decline as well as to convince investors not to abandon the Company. In particular, Defendants became increasingly reliant on what ultimately became known as Bridgepoint's Full Tuition Grant ("FTG") program.

3.      However, instead of properly recognizing revenue from the FTG program, throughout the Class Period, Defendants engaged in securities fraud by disseminating numerous materially false financial statements that reported artificially inflated revenue, net income, and accounts receivables figures and by failing to disclose that: (i) Bridgepoint's processes for recording revenue, deferred revenue, accounts receivable, and bad debt expense for its FTG program were not designed or employed properly; (ii) Bridgepoint failed to maintain effective

1

internal controls over financial reporting; and (iii) due to the foregoing deficiencies, Bridgepoint was prone to and did record material accounting errors related to revenue, deferred revenue, accounts receivable, and its provision for bad debts, which resulted in the overstatement of revenue and accounts receivable, and the misstatement of all of the foregoing accounts in its financial statements for the Class Period.

4.      Defendants made these errors during the Class Period even though just a few years earlier, in 2014, the SEC had found very similar problems with the Company's revenue recognition practices—which were serious enough that the SEC forced Bridgepoint to restate its financial statements for 2013.

5.      On March 7, 2019, Bridgepoint announced that it had "determined to restate the Company's previously issued unaudited condensed consolidated financial statements, and advised that those financial statements should not be relied upon, for the three and nine months ended September 30, 2018." Bridgepoint stated that the processes used for recording revenue for the FTG program portion of its student contracts "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, accounts receivable, deferred revenue, and its provision for bad debts, which resulted in the overstatement of revenue and accounts receivable, and the misstatement of all of the foregoing accounts in its financial statements for the Class Period.

6.      On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume.

7.      On March 12, 2019, Bridgepoint detailed the necessary restatements in its annual report on Form 10-K for 2018 (the "2018 10-K") and its amended quarterly report for the third quarter of 2018 (the "2018 Q3 10-Q/A"). In particular, the Company's financials for the first three quarters of 2018 had to be restated as follows: net income decreased by $5.8 million ($23.8M to $18.05M), revenue decreased $5 million ($353.7M to $348.7M), accounts receivable decreased by $4.7 million ($33.57M to $28.9M), and deferred revenue and student deposits (a liability account) increased by $4.5 million ($53.87M to $58.4M).

8.      Following this news, Bridgepoint's stock price fell once again, declining from

$7.00 on March 12, 2019 at close to $6.90 at close on March 13, 2019.

9.      As a result of Defendants' false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## **Jurisdiction and Venue**

10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered and maintains its principal place of business in this District and a significant portion of Defendants' actions took place in this District.

13.      In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## **Parties**

### **Plaintiff**

14.      **Lead Plaintiff Shiva Stein** acquired the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### **Defendants**

15.      During the Class Period, **Defendant Bridgepoint Education, Inc.** ("Bridgepoint" or the "Company") was a Delaware corporation with principal executive offices

3

located at 8620 Spectrum Center Blvd, San Diego, California. Its securities traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BPI."

16.     On April 2, 2019, the Company changed its name to Zovio Inc. and moved its headquarters to 1811 E. Northrop Blvd, Chandler, AZ 85286. The Company transferred its stock to the Nasdaq Global Select Market effective April 15, 2019, where its stock began trading under the ticker symbol ZVO.

### *Individual Defendants*

17.     **Defendant Andrew S. Clark** co-founded Bridgepoint in November 2003 and has served as at all relevant times as CEO, President, and a director of Bridgepoint. Throughout the Class Period, Defendant Clark spoke frequently to investors at industry conferences and on quarterly earnings calls and had the power and authority to control the contents of the Company's public filings with the SEC. Prior to launching Bridgepoint, Defendant Clark consulted with several private equity firms examining the postsecondary education sector. Defendant Clark worked for Career Education Corporation as Divisional Vice President of Operations and Chief Operating Officer for American InterContinental University in 2002. From 1992 to 2001, Defendant Clark worked for Apollo Group, Inc., where he served in various management roles, culminating in his position as Regional Vice President for the Mid-West region from 1999 to 2001. Defendant Clark earned an M.B.A. from the University of Phoenix and a B.A. from Pacific Lutheran University.

18.     **Defendant Joseph L. D'Amico** served as Bridgepoint's Interim CFO from October 16, 2017 until April 16, 2018. Throughout the Class Period, Defendant D'Amico spoke frequently to investors at industry conferences and on quarterly earnings calls and had the power and authority to control the contents of the Company's public filings with the SEC. He currently serves as the Senior Advisor to the CEO. Previously, D'Amico was the President of Apollo Education Group, Inc. from December 2011 to March 2013 and its interim Chief Financial Officer from April 2015 until October 2015. Since August 2016, D'Amico has also been a Senior Advisor to the Chairman of Vocado, LLC, a real-time student data platform that

improves higher education funding, enrollment and performance through AI-enabled student finance management and actionable analytics.

19. **Defendant Kevin Royal** served as Bridgepoint's Chief Financial Officer ("CFO") from October 1, 2015 until October 13, 2017 and then since April 16, 2018. Throughout the Class Period, Defendant Royal spoke frequently to investors at industry conferences and on quarterly earnings calls and had the power and authority to control the contents of the Company's public filings with the SEC. Previously, he was Senior Vice President, Chief Financial Officer, Treasurer and Secretary of Maxwell Technologies, Inc., a developer, manufacturer and marketer of energy storage and power delivery solutions from April 2009 to May 2015. From May 2005 until April 2009, he was Senior Vice President and Chief Financial Officer of Blue Coat Systems, Inc., a previously Nasdaq-listed developer and provider of application delivery network technology. Before that he spent 10 years with Ernst & Young LLP, where he became a certified public accountant, and then served as vice president and chief financial officer of Novellus Systems, Inc., an S&P 500 company that manufactures, markets and services semiconductor capital equipment.

20. The following table summarizes the Individual Defendants' executive compensation, according to the Company's April 2019 Definitive Proxy Statement:

| Name | Total Compensation Received | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| Clark | $2,413,233 | $2,829,261 | $4,720,012 |
| Royal | $944,802 | $1,310,657 | $1,679,241 |
| D'Amico | | $308,808 | $1,028,139 |

21. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of

5

their positions with the Company, and their access to material information available to them but not to the public (as further detailed herein), the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## Relevant Accounting Standards

22.   The fraud alleged herein arises, in part, from Defendants' admitted violations of Generally Accepted Accounting Principles ("GAAP"). Throughout the Class Period, Defendants stated that the Company's financial statements were "prepared in accordance with" GAAP, as required by SEC regulations.

23.   GAAP is the authoritative accounting standards for the financial reporting of public companies in the United States. The SEC requires that public companies present financial statements in accordance with GAAP. "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures." 17 C.F.R. § 210.4-01(a)(1).

24.   GAAP has been codified by the Financial Accounting Standards Board ("FASB") in its Accounting Standards Codifications ("ASC"). The FASB has also issued guidance in the form of Statements of Financial Accounting Concepts ("FASCON"s), which set forth the conceptual framework underlying GAAP, as well as its objectives, qualitative characteristics, and other concepts used in the development of GAAP.

25.   As the FASB has explained, the "objective of general-purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to

the entity." (FASCON No. 8, OB2[1]). FASCON No. 8 continues in relevant part:

> Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity…. Consequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity.

> To assess an entity's prospects for future net cash inflows, existing and potential investors, lenders, and other creditors need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources….

> Many existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed.

(FASCON No. 8, OB3–OB5).

26.     FASCON No. 8 also notes that, for financial information to be useful, "it must be relevant and faithfully represent what it purports to represent," and its usefulness "is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). It elaborates in relevant part:

> Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources.

>                                    * * *

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent

---

[1] FASB, FASCON No. 8, *Conceptual Framework for Financial Reporting - Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information* (Sep. 2010), available at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176157498129 .

relevant phenomena, but it also must faithfully represent the
phenomena that it purports to represent. To be a perfectly faithful
representation, a depiction would have three characteristics. It would
be complete, neutral, and free from error.

(FASCON No. 8, QC6, QC12).

### Accrual Accounting under GAAP

27.     The conceptual framework of financial reporting under GAAP is based primarily
on the idea of "accrual" accounting. As explained in FASCON No. 6:

Accrual accounting attempts to record the financial effects on an entity
of transactions and other events and circumstances that have cash
consequences for the entity in the periods in which those transactions,
events, and circumstances occur rather  than only in the periods in
which cash is received or paid by the entity…. It recognizes that the
buying, producing, selling, distributing, and other operations of an
entity during a period, as well as other events that affect entity
performance, often do not coincide with the cash receipts and
payments of the period….

\* \* \*

Accrual accounting attempts to recognize noncash events and
circumstances as they occur and involves not only accruals but also
deferrals, including allocations and amortizations. Accrual is
concerned with expected future cash receipts and payments: it is the
accounting process of recognizing assets or liabilities and the related
liabilities, assets, revenues, expenses, gains, or losses for amounts
expected to be received or paid, usually in cash, in the future.

(FASCON No. 6, ¶¶139–41[2]).

28.     FASCON No. 8 also speaks to accrual accounting as follows, in relevant part:

Accrual accounting depicts the effects of transactions, and other events
and circumstances on a reporting entity's economic resources and
claims in the periods in which those effects occur, even if the resulting
cash receipts and payments occur in a different period. This is

---

[2] FASB, FASCON No. 6, *Elements of Financial Statements* (Dec. 1985), available at
https://www.fasb.org/pdf/aop_CON6.pdf.

8

> important because information about a reporting entity's economic
> resources and claims and changes in its economic resources and claims
> during a period provides a better basis for assessing the entity's past
> and future performance than information solely about cash receipts
> and payments during that period.

(FASCON 8, OB17).

29.     FASCON No. 6 describes how a company is to reflect transactions within the financial reporting periods to which component costs and associated revenues relate. This concept reflects the "matching principle" of accounting, which is the core of accrual accounting. FASCON No. 6 explains in relevant part:

> Accrual accounting uses accrual, deferral, and allocation procedures
> whose goal is to relate revenues, expenses, gains, and losses to periods
> to reflect an entity's performance during a period instead of merely
> listing its cash receipts and outlays. Thus, recognition of revenues,
> expenses, gains, and losses and the related increments or decrements in
> assets and liabilities--including matching of costs and revenues,
> allocation, and amortization--is the essence of using accrual
> accounting to measure performance of entities. The goal of accrual
> accounting is to account in the periods in which they occur for the
> effects on an entity of transactions and other events and circumstances,
> to the extent that those financial effects are recognizable and
> measurable.

> Matching of costs and revenues is simultaneous or combined
> recognition of the revenues and expenses that result directly and
> jointly from the same transactions or other events. In most entities,
> some transactions or events result simultaneously in both a revenue
> and one or more expenses. The revenue and expense(s) are directly
> related to each other and require recognition at the same time.

(FASCON 6, ¶¶ 145–46).

30.     Accrual-based activity is reflected primarily in an entity's income statement, and for purposes of the determination of net income in accordance with GAAP. As noted above, the SEC requires that public companies present financial statements in accordance with GAAP. Violations of GAAP, therefore, including with respect to accrual-based accounting, equate to violations of SEC Regulations (for publicly-traded companies).

9

### Revenue Recognition

31.     Revenue is a critical measure both for entities trying to earn a profit from their operations as well as users of financial statements trying to assess an entity's financial performance and position. Revenue measures, in the most basic sense, "the transfer of promised goods or services to customers in an amount that reflects the consideration" that the entity would expect to receive for providing those goods or services. (ASC 606-10-05-3[3])

32.     The accrual-based financial reporting framework of GAAP is particularly concerned with the proper procedures for "recognition" of revenue. FASCON No. 6 describes recognition as follows:

> Recognition is the process of formally recording or incorporating an item in the financial statements of an entity. Thus, an asset, liability, revenue, expense, gain, or loss may be recognized (recorded) or unrecognized (unrecorded).

(FASCON No. 6, ¶ 143). In accordance with the matching principle discussed above, revenue is measured and reflected in financial statements as the amount that qualifies for recognition, for goods or services provided, over (or throughout) a specific period of time.

33.     Under GAAP, the first step in evaluating revenue recognition is to understand the economics of the transaction or arrangement. Developing this understanding would include consideration of relevant contracts or agreements, including obtaining an understanding of the products and/or services to be delivered.

34.     Under FASCON No. 5, "[r]evenues are not recognized until earned" and "are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (FASCON No. 5, ¶83[4]).

---

[3] FASB, ASC 606, *Revenue from Contracts with Customers* (May 2014), available at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176164076069&acceptedDisclaimer=true.

[4] FASB, FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* (Dec. 1984), available at https://www.fasb.org/pdf/aop_CON5.pdf.

35.     In December 1999, the SEC published Staff Accounting Bulletin ("SAB") No. 101[5] ("SAB 101"), which provides interpretive guidance on how a public entity should apply the revenue recognition criteria set forth in FASCON No. 5. Under SAB 101, revenue should not be recognized until it is "realized or realizable and earned," and therefore an entity should not recognize revenue until "all of the following criteria are met":

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectibility is reasonably assured.

(SAB 101).

36.     These concepts were subsumed by the FASB framework for accounting rules with ASC 605, *Revenue Recognition*, which was applicable for the first portion of the Class Period.

37.     However, beginning January 1, 2018, public companies were required to adopt a new revenue standard set forth in ASC 606. This standard not only includes identifiable changes to the way revenue is recognized, centered significantly on the recording of known offsets to revenue at the time transactions are recorded, but also affects prior industry-specific rules surrounding the recording of revenue and accounting for the collection of receivables.

38.     Under ASC 606, more specific criteria must be met for an entity to recognize revenue. As set forth in the Summary of ASC 606:

> The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.
>
> To achieve that core principle, an entity should apply the following steps:

---

[5] SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, 17 C.F.R. Part 211 (Dec. 3, 1999), available at http://www.sec.gov/interps/account/sab101.htm.

Step 1: Identify the contract(s) with a customer.

Step 2: Identify the performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

(ASC 606 at 2; *see also* ASC 606-10-05-2 to -4.)

39.     ASC 606 also identifies additional conditions upon which each principle's criteria would be considered met. Specifically, "identifying a contract" for Step 1 requires that all the following criteria be satisfied:

a)  The parties to the contract have approved the contract and are committed to perform their respective obligations.

b)  The entity can identify each party's rights regarding the goods or services to be transferred.

c)  The entity can identify the payment terms for the goods or services to be transferred.

d)  The contract has commercial substance.

e)  It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer … [and] the amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

(ASC 606-10-25-1.)

40.     As for determining when "the entity satisfies a performance obligation" (for Step 5 above), ASC 606 explains that such performance obligation is satisfied when a "promised good or service (that is, an asset)" is transferred "to a customer" and that "[a]n asset is transferred when (or as) the customer obtains control of that asset." (ASC 606-10-25-23).

41.     As applied to Bridgepoint, the "promised good or service" to Bridgepoint's

"customers" (i.e. its students) is the right to receive education, through established coursework, for an agreed price. This right is afforded students whether cash is received upfront or a receivable is established concomitant with the start of a course.

42.    The matching principle discussed further above is critical in order to ensure that revenues (and expenses) are allocated to the appropriate reporting periods, either to reflect the period during which revenue was actually earned or, in the event that payment for the provision of such goods or services is not collectible, In view thereof, ASC 606 prescribes the following guidance for whether a performance obligation is satisfied over time or at a point in time:

*Performance obligations satisfied over time (only one criteria must be met)*

a)  The customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs.

b)  The entity's performance creates or enhances an asset that the customer controls as the asset is created or enhanced.

c)  The entity's performance does not create an asset with an alternative use to the entity.

...

*Performance obligations at a point in time (i.e., transfer of control)*

a)  The entity has a present right to payment for the asset.

b)  The customer has legal title to the asset.

c)  The entity has transferred physical possession of the asset.

d)  The customer has the significant risks and rewards of ownership of the asset.

e)  The customer has accepted the asset.

(ASC 606-10-25-27, -30).

43.    In the case of student enrollment, and the recognition of revenue appropriate in such circumstances, it is apparent—and the Company itself acknowledged, that revenue was earned over time (i.e., over the course of the enrollment, as services were provided to the student). GAAP also requires that provisions be made in the financial statement to reflect the uncertainty of collectability on receivables. Under ASC 605, the standard that preceded

13

adoption of ASC 606, and in conjunction with ASC 310, *Receivables* (discussed in more detail below), amounts recorded as revenue but for which cash was not immediately received, need to be evaluated regularly for collectability.

44.     Under ASC 606, as item (e) from ASC 606-10-25-1 excerpted above states, "the amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession." This directly impacts the measurement of revenue and the recognition thereof, under the new standard, reflective of whether the entity expects, either based on an explicit arrangement with a customer in the moment or historical experience, to collect the full amount of the transaction price.

45.     Under 606, the concept of a "price concession" can be either explicit or, as it is described in the accounting literature, implicit.  An implicit price concession exists when the parties to the transaction effectively understand that the amount of "gross revenue" attached to the transaction is not the same as the expected consideration to be paid or transferred in connection with the goods or services provided.

46.     According to ASC 606-10-55, the determination of whether the customer has the "ability and intention to pay the consideration to which the entity will be entitled in exchange for the goods or services," which can impact whether there is an implicit price concession, includes evaluation of "whether there is a substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model in [ASC 606]."

47.     This relates, however, only to the recording of revenue transactions that occurred beginning on January 1, 2018 and thereafter. The standard contemplates, further, that, similar to the way revenue and receivables were accounted for prior to adoption of ASC 606, later determinations that an amount is probable to be uncollected (i.e., in the case of an adverse event that impacted a customer's, or in this instance, a student's, ability to pay, under ASC 605) result in the recording of "bad debt expense" in the period in which such determination is made (discussed in more detail below) – journal entries which would not, therefore, impact the

14

amount of revenue previously recorded on the subject transaction(s) or on different transactions in the present period. But under both ASC 605 and ASC 606, both before and after January 1, 2018, Bridgepoint was required to consider whether the amount of revenue it was recording for student tuition—especially under the FTG Program—reflected the amounts both to which it was entitled and for which collectability was reasonably assured.

### *Accounting for Revenue before 2018*

48.     Before the adoption of ASC 606 on January 1, 2018, Bridgepoint asserted that it recognized revenue according to ASC 605.

49.     Under ASC 605, subsequent consideration of collectability was considered in the context of receivables, and the proper measurement thereof under ASC 310, *Receivables*. Because all sales are not effectuated through the immediate exchange of cash, but also because GAAP requires public filers to utilize accrual-based accounting, entities often record accounts receivable (an asset) in connection with transactions that involve revenue. ASC 310 describes receivables as what "may arise from credit sales, loans, or other transactions," and "may be in the form of loans, notes, and other types of financial instruments and may be originated by an entity or purchased from another entity." (ASC 310-10-05-4).

50.     This asset is maintained on an entity's books and records until the amount is either (a) received in the form of cash (generally), or (b) deemed to be uncollectible. GAAP requires that receivables be measured periodically to ensure that the amounts at which they are being carried on an entity's balance sheet are commensurate with and reflective of the extent to which such receivables are expected to be collected because, as the guidance provides, "[t]he conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a contingency exists." (ASC 310-10-35-7).

51.     In ASC 310, GAAP prescribes that an entity record a reserve (known as a contra-asset account), often referred to as an allowance for doubtful accounts and/or an allowance for credit losses, to account for those amounts it believes are probable to be uncollected.

52.     GAAP states, specifically, the following with respect to how and when to adjust

15

the balance of a receivable to reflect the collectability of (or, to the contrary, the expected losses from) such:

> [GAAP] requires recognition of a loss when both of the following conditions are met:
>
>> a. Information available before the financial statements are issued or are available to be issued … indicates that it is probable that an asset has been impaired at the date of the financial statements.
>>
>> b. The amount of the loss can be reasonably estimated.
>>
>> ….
>
> Losses from uncollectible receivables shall be accrued when both of the preceding conditions are met. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

(ASC 310-10-35-8 to -9).

53.     Considering the preceding guidance, GAAP provides that an entity which carries significant assets in the form of receivables must not only reflect such assets at their proper carrying value, but must regularly and methodologically assess the collectability of its receivables at each reporting date. GAAP prescribes specifically, in ASC 310-10-35-41, that an entity must deduct credit losses directly from the allowance when the entity becomes aware that a balance is no longer collectible. And, as stated above, the same treatment is applicable to similar scenarios subsequent to the adoption of the new revenue recognition standard (ASC 606), especially when and if later determinations about collectability are related to customers' ability to pay for "credit"-related reasons.

54.     According to ASC 606-10-55-108, if an entity realizes that a "customer's financial condition declines … and fails to "make [sic] … payments," the entity may "account for any impairment of the existing receivable in accordance with [ASC 310]." At a public meeting of the FASB/IASB Joint Transition Resource Group for Revenue Recognition (ASC

606) on January 26, 2015, the staff stated, "[t]he new revenue standard does not change the accounting for receivables. An entity accounts for a receivable in accordance with [ASC 310]."

55.    As discussed previously herein, however, to the extent collectability is not reasonably assured at the time an entity enters into a transaction with a customer (or, in the case of Bridgepoint, a student), or when an entity can determined, from its historical business experience, that all amounts it initially invoices or asserts constitutes revenue will not ultimately be collected, revenue may *not* be recognized until if, and when, the associated consideration is received from the customer (/ student).

### *Accounting for Revenue beginning January 1, 2018*

56.    Beginning January 1, 2018, Bridgepoint, as required by GAAP and, therefore, the SEC, adopted ASC 606. In its 2018 10-K, Bridgepoint communicated the following to investors regarding this adoption:

> [T]he Company adopted ASC 606 using the modified retrospective adoption method. In accordance with the modified retrospective adoption method, the Company elected to retroactively adjust only those contracts that did not meet the definition of a completed contract at the date of initial application. The new guidance impacted the amount and timing of the Company's revenue recognition as follows:

> … Under ASC 606, collectability issues may indicate an implied price concession, which is accounted for as variable consideration. Consequently, revenues for these type of contracts are accelerated, net of any amounts we do not expect to collect.

> Under ASC 606, once a student is deemed to have a history of collection issues, future revenues are earned subject to a price concession as the student has demonstrated that they may not pay the full tuition price based on past behavior. This results in a reduction in the transaction price such that revenue is recorded based on the amount to which the Company expects to be entitled if, in the future, a student is deemed to have resolved their collection issues, a price concession will no longer be recorded.

17

> At the date of adoption of ASC 606, the Company recorded a cumulative adjustment to its consolidated balance sheet, including an adjustment to retained earnings, to adjust for the aggregate impact of these revenue items, as calculated under the new guidance.

(2018 10-K, p. 74)

57.    In connection with the adoption of ASC 606, Bridgepoint was expressly obligated to assess the amount of consideration it ultimately expected to receive, based on the probability of collecting tuition (among other sources of revenue) from a corporate payer or a student (or the student's source of funding), at the moment it entered into a transaction with a student or employer (as opposed to at a later point in time based on "collectability" in the context of ASC 310).  If there is an understanding or expectation between the parties entering into the transaction that some amount less than the contract amount would be paid in the form of consideration, ASC 606 asserts that the entity recording revenue must account for this "implicit price concession" by offsetting its recorded gross revenue at the time of the transaction.

### *Accounting for the FTG Program*

58.    Bridgepoint explained the following about its FTG program, specifically:

> [It] is a ***12-month grant*** that, when combined with a corporate partner's annual tuition assistance program, enables eligible students to earn their degree without incurring student loan debt. Students enrolled under this program are eligible to take up to ten undergraduate or eight graduate courses per 12-month grant period and must first utilize 100% of the funds awarded under their employer's annual tuition assistance program before they can be awarded the FTG grant.

(2018 10-K, p. 71; emphasis added.)

59.    With respect to the FTG Program, specifically, Bridgepoint accounted for revenue by first recording deferred revenue in the amount of the cost of the services being afforded to the enrolled student, and then reversing (i.e., reducing) this amount over time, as revenue was earned "over the period of benefit to the student." (2017 10-K, p. 47). Bridgepoint explained its revenue recognition policy in its 2017 10-K (issued on February 15, 2018) as

18

follows:

> We record an account receivable and corresponding deferred revenue
> for the amount of tuition and fees for enrolled students when a student
> is billed for a payment period. Payments received either directly or
> indirectly from the student or from the student's source of funding that
> exceed amounts billed are recorded as student deposits. At the end of
> each reporting period, the deferred revenue and student deposits and
> related account receivable balances are reduced to present amounts
> attributable to the current course.

(2017 10-K, p. 47.)

60.     With respect to the collectability of recorded receivables, or instances where students did not complete the course in which they were enrolled, Bridgepoint communicated the following to investors in its 2017 10-K:

> We estimate expected refunds based on historical refund rates and
> record a provision to reduce revenue for the amount that is expected to
> be refunded. Refunds issued by us for services that have been provided
> in a prior period have not historically been material. Future changes in
> the rate of student withdrawals may result in a change to expected
> refunds and would be accounted for prospectively as a change in
> estimate. We reassess collectability throughout the period revenue is
> recognized by our institutions, on a student-by-student basis. We
> reassess collectability based upon new information and changes in
> facts and circumstances relevant to a student's ability to pay. For
> example, we reassess collectability when a student drops from the
> institution (i.e., is no longer enrolled)[6] and when a student attends a
> course that was not included in the initial assessment of collectability
> at the start of a student's payment period.

(2017 10-K, p. 47; footnote added.)

61.     The grants awarded as part of this FTG program were "considered a material right, and, as such, the Company record[ed] a contract liability (i.e., in the line item "deferred

---

[6] Note that, as reflected in the Company's public disclosures, a student's decision or requirement to drop-out of a course (or from the institution itself) does not appear to have impacted revenue recognition, but instead, merely the means by which payment might be made and the likelihood of collection of outstanding tuition-related fees.

revenue and student deposits") for a portion of the consideration received or due under these contracts." (2018 10-K p. 71). Bridgepoint would then, as under the prior accounting construct, reverse this liability over time as revenue was earned through the provision of services to students. Bridgepoint's public disclosures assert that revenue for purposes of the FTG program was fully earned "at the earlier of satisfaction of the future obligation or contract termination." (2018 10-K, p. 71).

62.     Bridgepoint's public filing did not explain to investors, however, what was meant by "contract termination" in this instance, how it may have differed from the moment at which the future obligation was satisfied, or what such treatment necessitated. As stated earlier, according to ASC 606, in order for an entity to recognize revenue, it must "[i]dentify the performance obligations in the contract." (ASC 606-10-05-4, (b)). As such, it was not apparent to investors how or when revenue was being recognized at Bridgepoint. The "satisfaction of the future obligation" may have been referencing completion of the entirety of the contract that Bridgepoint has with an employer or student (i.e., the coursework to be completed over a semester, or year), or a certain point in the semester when a student could no longer withdraw from a program or drop-out of a course for a refund. In addition, "contract termination" could be referencing either (a) if/when a student withdrew during the semester or (b) an instance where the student received more than two "allowances"[7] under the FTG program guidelines and became ineligible therefor. Bridgepoint's accounting policy did not identify which party (i.e., the employer, the student, or the university) bore the obligation for payment of outstanding amounts when a contract was terminated, or how it estimates allowances against revenue for these situations. Bridgepoint did not provide identifiable information in the financial statements it issued during the Class Period to communicate to investors when exactly a contract's performance obligations are considered met.

---

[7] According to Bridgepoint's FTG policy as of December 2018, a student became ineligible for the program if he/she received more than two allowances or if he/she violated university policies outlined in the Ashford University Academic Catalog. If the student became ineligible, the university would automatically revert the student to a cash payment option.

63.     According to Bridgepoint's stated policy regarding the FTG program, if a student's tenure in the FTG program was terminated, that student was converted to a cash-pay option, at which point Bridgepoint would have needed to look to the student to provide payment for the remaining tuition. Except there is a higher likelihood the actual student may not have had sufficient funds to cover the tuition—which Bridgepoint had been forced to acknowledge in connection with its 2013 restatement, which was precipitated by an investigation by the SEC into Bridgepoint's revenue recognition practices that began in 2014 (among others) . If Bridgepoint did not properly assess whether collectability was reasonably assured and either wait on revenue recognition until cash was received or estimate the allowance for bad debts (under ASC 605 and ASC 310), or account for an implicit price concession (under ASC 606), its financial statements would be misstated for overstating revenues or for an impairment or overstatement of accounts receivable.  The Company's 2018 restatement confirmed that Bridgepoint did not, in its Class Period financial statements, properly apply the foregoing guidance, which caused material errors in those subject financial statements—giving rise to this litigation.

### **Internal Controls**

64.     The Securities and Exchange Act of 1934 also imposes on an entity's management the obligation of establishing, implementing, and maintaining the system of internal control over financial reporting, such that the company's books and records conform to the selected basis of accounting.

65.     After a series of high profile financial scandals relating to large public companies (and their auditors) that occurred in the early 2000s, the Sarbanes-Oxley Act of 2002 ("SOX") was enacted to purportedly protect the investments of shareholders and the general public from potentially improper actions or misrepresentations by public companies.

66.     One of the key provisions of Section 404 of SOX reiterated the need for management at public companies to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls

and procedures to ensure their effectiveness, as well as to assess and report on the design and

operating effectiveness of internal control over financial reporting on at least an annual basis.

67.    An overall purpose of internal control over financial reporting is "to provide

reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted accounting

principles." SEC General Rules and Regulations (17 C.F.R. § 240.13a-15(f)) defines the term

"internal control over financial reporting" (or "ICFR") as:

> … a process designed by, or under the supervision of, the issuer's
> principal executive and principal financial officers, or persons
> performing similar functions, and effected by the issuer's board of
> directors, management and other personnel, to provide reasonable
> assurance regarding the reliability of financial reporting and the
> preparation of financial statements for external purposes in accordance
> with generally accepted accounting principles and includes those
> policies and procedures that:
>
>> (1) Pertain to the maintenance of records that in reasonable
>> detail accurately and fairly reflect the transactions and
>> dispositions of the assets of the issuer;
>>
>> (2) Provide reasonable assurance that transactions are recorded
>> as necessary to permit preparation of financial statements in
>> accordance with generally accepted accounting principles, and
>> that receipts and expenditures of the issuer are being made only
>> in accordance with authorizations of management and directors
>> of the issuer; and
>>
>> (3) Provide reasonable assurance regarding prevention or
>> timely detection of unauthorized acquisition, use or disposition
>> of the issuer's assets that could have a material effect on the
>> financial statements.

68.    As part of SOX, management of companies that are registered and make filings

with the SEC is required to make assertions regarding the design and effectiveness of the

entity's system of internal controls over financial reporting. Additionally, SOX requires

management to: (a) acknowledge its responsibility for the adequacy of the company's internal

control structure and procedures for financial reporting; and (b) assess the effectiveness of this

ICFR.

69. The annual internal control report must contain:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective;

- A statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting; and

- A statement that the public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting.

(SOX, Item 307).

70. SEC Regulation S-K (17 C.F.R. § 229.308 [Item 308] (a)) describes what information should be included in management's report on ICFR, including the following:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or §240.15d-15 of this chapter;

(3) Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more

23

material weaknesses in the registrant's internal control over financial reporting.

71.     Additionally, SOX requires management to: (a) acknowledge its responsibility for the adequacy of the company's internal control structure and procedures for financial reporting; and (b) assess the effectiveness of this ICFR.

72.     Many U.S. public companies, including Bridgepoint (as expressly stated in its previously-issued financial statements during, and prior to, the relevant period), have adopted the integrated framework for establishing and maintaining a system of internal controls (originally published and) established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 1992 (the "COSO Integrated Framework"). (*See, e.g.*, Bridgepoint Education's 2018 10-K, p. 100). The COSO Integrated Framework assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties as they relate to the establishment and maintenance of internal controls, without being overly prescriptive (recognizing that the size and operations of subject entities may differ). It does so by providing both an understanding of what constitutes a system of internal controls and insight into when internal controls are being applied effectively.

73.     COSO's integrated framework stipulates that:

> [A]n effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories of objectives – that is, operations, reporting, and compliance. It requires that (i) each of the five components of internal control and relevant principles is present and functioning, and that (ii) the five components are operating together in an integrated manner.

(COSO Internal Control-Integrated Framework Frequently Asked Questions, May 2013)

74.     The five integrated components of internal control outlined in the Integrated Framework are:

a)  Control Environment

b)  Risk Assessment

c)  Control Activities

d)  Information and Communication

e)   Monitoring

75.     In view of the requirements for public companies to establish, maintain, and report on their systems of internal controls (including as such controls relate to financial reporting), a material weakness in a system of internal controls is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. *See* 17 C.F.R. § 210.13a-15(f).

76.     If a Company identifies a material weakness, it is obligated to disclose such to the public domain. In addition, management is not permitted to conclude that a company's internal control over financial reporting is effective if there are one or more material weaknesses such system of internal control over financial reporting. COSO's framework for internal controls concurs with this assertion.

# **Factual Background**

## **Rapid Growth**

77.     Bridgepoint is a provider of post-secondary education services. The Company was incorporated in Delaware in May 1999 under the name TeleUniversity, Inc., changed its name to Bridgepoint Education, Inc. in February 2004, and went public in 2009.

78.     Originally, Bridgepoint was a provider of "affordable, accelerated work-place related courses for adult students seeking a bachelor's degree" backed by the global private equity firm Warburg Pincus. But its business model changed dramatically in March 2005, when it acquired what became Ashford University.

79.     Before the acquisition, Ashford University was a small regionally accredited non-profit religious college in Iowa called the Franciscan University of the Prairies. It operated as a traditional nonprofit college, but it had only 312 students and was on the verge of closure. Bridgepoint vowed to pour resources into the college's physical campus and bolster its enrollment and revenues with online programs. Specifically, Bridgepoint's press release

announcing the acquisition stated:

> The University's agreement with Bridgepoint ensures that the main campus of the college will continue to be operated as it currently is. In addition, Bridgepoint does not anticipate any changes in course offerings, programs or graduation dates. Bridgepoint does plan to expand the student body at the University's main campus over the next two years in order to make the institution more viable and offer a wider array of enrichment opportunities for students.

80.     After the acquisition, Bridgepoint renamed it to "Ashford University" and began operating it as a for-profit commercial venture. Ashford offered associate's, bachelor's and master's degree programs and was comprised of four colleges: the Forbes School of Business and Technology, the College of Education, the College of Health, Human Services and Science and the College of Liberal Arts.

81.     In September 2007, Bridgepoint bought the Colorado School of Professional Psychology in Colorado Springs and renamed it University of the Rockies. At the time of acquisition, the school had 75 students and did not offer any online courses or programs. After the acquisition, the University of the Rockies offered master's and doctoral degree programs in the social and behavioral sciences.

82.     Over the next decade, Ashford grew rapidly, eventually peaking at more than 90,000 students. However, virtually all of Bridgepoint's enrollment growth was online. *Inside Higher Ed*[8] summarized as follows:

> Over the next 10 years, Bridgepoint's takeover of Ashford became exhibit A of one of the perceived questionable tactics of for-profit higher education: the "buying" of accreditation, by annexing an existing institution and transforming it into something very different (almost always online, and usually on a mass scale). The small Iowa campus became a springboard for a publicly traded college company with (at one point) soaring online enrollments and significant profits,

---

[8] Doug Lederman, *Closure Delayed (by a Decade)*, Inside Higher Ed., July 15, 2015, https://www.insidehighered.com/news/2015/07/15/ashford-us-closure-and-what-it-says-about-profit-higher-ed.

drawing the enmity of U.S. senators and prompting significant scrutiny of the accrediting agency that approved the initial transaction.

* * *

Bridgepoint officials told *Inside Higher Ed* at the time that no Ashford employees would lose their jobs in the transition and that the company was "committed absolutely" to remaining in Clinton, Iowa. Clark, the CEO, said that Bridgepoint would work to expand two small master's programs that Ashford offered at the time.

What an understatement. By 2012, Ashford's enrollment had soared to more than 90,000, with all but about 1,000 students online. That phenomenal growth enabled company officials to take Bridgepoint public in 2009 and led to high-visibility (and arguably unwise) steps like buying naming rights to a college football bowl game.

83.      According to a 2012 U.S. Senate Committee on Health, Education, Labor, and Pensions Report, "Bridgepoint has experienced some of the most dramatic increases in student enrollment, Federal funds, and profit of any company examined. Along with this rapid growth, have come rapid increases in student withdrawal rates…. These outcomes call into question whether Bridgepoint's students are receiving an education that affords them to the ability to repay the loan debt they incurred."

## Sharply Declining Enrollments Expose Bridgepoint to New Risks

84.      Around 2012, after years of rapid growth, Bridgepoint's business prospects started declining rapidly. Enrollment started declining quickly every year, which devastated Bridgepoint's revenue and operating income:

|  | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
|---|---|---|---|---|---|---|
| **Revenue (in thousands)** | $943,405 | $751,449 | $638,705 | $561,729 | $527,090 | $478,397 |
| **Operating Income (in thousands)** | $191,627 | $68,463 | $14,311 | -$42,295 | -$40,221 | $7,852 |
| **Total Enrollment** | 81,810 | 63,624 | 55,823 | 49,159 | 45,087 | 40,730 |

85.      By 2015, Bridgepoint could no longer afford to maintain Ashford University's

27

physical campus, and was forced to shut down the physical campus.

86.     Following this sudden reversal in the Company's business prospects, Defendants began taking drastic measures to reverse the decline as well as to convince investors not to abandon the Company. Declining enrollments also exposed Bridgepoint to significant new regulatory risks and forced it to seek new revenue streams to reduce their reliance on federal student aid funds at a time of increasing regulatory scrutiny.

### *Bridgepoint's Efforts to Remain Compliant with the "90/10" Rule*

87.     Because Bridgepoint consistently derived the vast majority of its revenue from federal student aid programs, it was critical to remain eligible for those programs. By 2012, more than 85% of Bridgepoint's revenues came from federal student aid funds under Title IV of the Higher Education Act (which includes Stafford loans, Pell grants, PLUS loans, and multiple other small loan and grant programs). Therefore it was essential for Bridgepoint to retain its eligibility for federal student aid funds under Title IV.

88.     In particular, under Title IV's "90/10" Rule, in order to maintain access to federal student aid funds, Ashford University and University of the Rockies had to generate at least 10% of their revenues from sources other than federal student aid under Title IV.

89.     The idea behind the 90/10 Rule is that if an institution is indeed providing a valuable education, someone other than the federal government should be willing to pay that price for students to attend; and federal student aid funds should not be wasted propping up low-quality schools that can't even attract at least 10 percent of their revenue from employers, scholarship providers, or students who are willing to pay the tuition.

90.     Importantly, the 90/10 Rule was originally enacted in the 1990s because students were defaulting on federal student loans in droves, and the worst default and repayment rates were concentrated among the for-profit institutions that were most reliant on federal student aid.

91.     Bridgepoint described the 90/10 rule as follows in its 2014 10-K:

**The "90/10" Rule**

> Under the Higher Education Act, a for-profit institution loses its eligibility to participate in Title IV programs if the institution derives more than 90% of its revenues (calculated in accordance with applicable Department regulations) from Title IV program funds for two consecutive fiscal years. This rule is commonly referred to as the "90/10 rule." Any institution that violates the 90/10 rule for two consecutive fiscal years becomes ineligible to participate in Title IV programs for at least two fiscal years. In addition, an institution whose rate exceeds 90% for any single year will be placed on provisional certification and may be subject to other enforcement measures.

> For the years ended December 31, 2014, 2013 and 2012, Ashford University derived 83.4%, 85.6% and 86.4%, respectively, and University of the Rockies derived 88.3%, 87.6% and 87.3%, respectively, of their respective revenues (calculated in accordance with applicable Department regulations) from students whose source of funding is through Title IV funds.

92.     By 2012, more than 85% of Bridgepoint's revenues came from Title IV funds—perilously close to the 90% cap. To avoid running into the 90% cap, Bridgepoint had to find new sources of revenue—at a time when its overall enrollment and revenue were quickly declining.

### *Bridgepoint's Increasing Reliance on the Full Tuition Grant ("FTG") Program*

93.     At first, Bridgepoint did this by seeking out "government tuition assistance for military personnel," such as under the GI Bill. Bridgepoint explained as follows in its 2015 10-K:

> Revenue derived from government tuition assistance for military personnel, including veterans, is not considered federal student aid for purposes of the 90/10 calculation, and accordingly helps our institutions satisfy the 90/10 rule. As of December 31, 2015, approximately 28.0% of our institutions' students were affiliated with the military, some of whom are eligible to receive government tuition assistance that may be used to pursue postsecondary degrees.

94.     However, for a number of reasons, Bridgepoint could not necessarily count on this revenue stream. As Bridgepoint noted in its 2015 10-K, "[f]rom October 1, 2013 until

29

October 16, 2013, the U.S. federal government entered into shutdown resulting in the suspension of military tuition assistance." And in May 2016, after the closure of Ashford University's physical campus, the Iowa Department of Education informed Bridgepoint that it would no longer approve Ashford University's programs for GI Bill benefits after June 30, 2016—which would impact all of Ashford's GI Bill students, not just those in Iowa. As a result, as Defendant Clark admitted on an August 2, 2016 conference call, Bridgepoint was forced to "temporarily suspend enrolling new VA students until we resolve the uncertainties regarding the VA approval."

95.   This continued into 2017. On November 9, 2017, the US Department of Veterans Affairs informed the Company that it would "suspend payment of educational assistance and approval of new enrollments and reenrollments for Ashford University's online programs in 60 days." On November 14, 2017, the Company announced that "Ashford University decided to temporarily suspend new enrollment of veteran students utilizing GI Bill benefits. Our veteran students comprise approximately 10% of our total enrollment and we currently estimate that our veteran students will generate approximately 7% of our revenue during fiscal 2017."

96.   As it became less and less able to rely on government tuition assistance for military personnel, Bridgepoint had to find other ways to increase enrollment and revenues from non-Title-IV sources.

97.   In particular, as another means of increasing enrollment, the Company formed various corporate partnerships with employers to offer their employees a way to pursue and complete a college degree purportedly without incurring any student debt. Over time, Bridgepoint became increasingly reliant on one such program—what it now calls its Full Tuition Grant ("FTG") Program.

98.   The 2016 10-K touted the Company's new "Leadership Development Grant" ("LDG") program—which it described as a "corporate partnership program" that "provides companies with the opportunity to allow their employees to pursue and complete a college degree without incurring any student debt"—as the "[o]ne area in which we continue to experience positive enrollment trends."

99.   The 2017 10-K touted the program as follows:

One area in which we are experiencing positive enrollment trends is within our Education Partnerships programs with various employers. These corporate partnership programs provide companies with the opportunity to offer their employees a way to pursue and complete a college degree without incurring any student debt. Enrollments in the Corporate Full Tuition Grant ("FTG") program is approximately 10% of our total enrollment as of December 31, 2017, compared to approximately 6% of our total enrollment as of December 31, 2016. Revenue derived from Education Partnerships is cash pay, and is therefore not considered federal student aid for purposes of calculations under the 90/10 rule.

100.   Defendant Clark also started describing the program in increasingly glowing terms. He described it as follows on an October 25, 2017 earnings call:

We also continue to strengthen our partnerships with various employers. Our work in this area has gained traction and become an important part of our strategy. To help establish a stronger brand identity for these corporate efforts, we utilized input from the companies currently in the program to select a new name that best describes the valuable work we are doing together. As a result, we have rebranded these employer offerings under the name Educational Partnerships. The Educational Partnerships Group includes our Full Tuition Grant, or FTG program, which was previously known as the Leadership Development Grant Program.

During the third quarter of 2017, Educational Partnerships added 12 new full tuition grant, or FTG partners. Student enrollment in these programs continues to increase, and FTG enrollments were up 75% as compared to the same quarter a year ago. As the convergence around -- as the conversations around student debt continue, these types of innovative partnerships are valuable examples of partnering with employers to provide an education to students without requiring them to take on any debt, while at the same time helping employers develop, retain and grow the skills of their employees.

101.   He was even more effusive on November 8, 2018:

As I mentioned earlier, the growth of our educational partnerships remains strong and this group continues to be a key driver of our

success. Our Full Tuition Grant program, which uses tuition assistance benefits provided by our corporate providers to provide a debt-free education to their employees, continues to gain traction as a popular option for fulltime workers looking to start or continue their degrees. During the third quarter of 2018, we added 16 new Full Tuition Grant partners to the program. Student enrollment from Full Tuition Grant was up approximately 48% as compared to enrollments the same quarter a year ago. While enrollment in our Full Tuition Grant programs has grown to approximately 15% of total enrollments, up from approximately 10% of total enrollments a year ago.

While each and every partner is critical to this program, in September we were particularly pleased to announce our partnership with US Express Enterprises. US Express publicly rolled out Full Ride, a first of its kind college scholarship program for company truck drivers and their families in partnership with Ashford University. By adopting this groundbreaking program, the company hopes to not only provide a meaningful benefit to its existing employees, but also to attract new employees that might not have previously considered driving a truck. Through the US Express Full Ride Scholarship, US Express will cover 100% of tuition for a BA or MA at Ashford University. Cover 2 members of the driver's family at one time, which could either be the company driver and a dependent or 2 dependents of the company driver. This could translate into 2 or more free degrees for each US Express Driver.

These programs continue to be well received by both employers and employees alike and they highlight the value of partnering with employers to offer programs that will allow their employees to pursue further education in a cost-friendly manner. We continue to anticipate students enrolled in these programs to become a meaningful percentage of our overall mix as we continue to raise awareness of and expand our corporate partnerships.

102.   The FTG program was structured differently from Bridgepoint's other course offerings. Typically, Bridgepoint would charge a set amount for each class and would recognize the tuition revenue from each class gradually over the course of the class term. Most courses were 5 or 6 weeks long. The FTG program was different. Bridgepoint explained the following about its FTG program, specifically:

> [It] is a ***12-month grant*** that, when combined with a corporate
> partner's annual tuition assistance program, enables eligible students
> to earn their degree without incurring student loan debt. Students
> enrolled under this program are eligible to take up to ten
> undergraduate or eight graduate courses per 12-month grant period and
> must first utilize 100% of the funds awarded under their employer's
> annual tuition assistance program before they can be awarded the FTG
> grant.

(2018 10-K, p. 71; emphasis added.)

103.    The FTG program thus differed from the Company's typical scholarships. Typically, scholarships would be tied to a "specific course, term or payment period." In contrast, the FTG program was a ***12-month grant*** under which students were "eligible to take up to ten undergraduate or eight graduate courses per 12-month grant period." The FTG scholarship was not tied to any specific class, and it had a far longer duration—12 months instead of 6 weeks.

## Bridgepoint Separates From its Accredited Institutions

104.    Ultimately, Bridgepoint realized that its best option was to abandon the whole idea of operating accredited academic institutions for profit.

105.    On March 13, 2018, the Company issued a press release titled "Bridgepoint Education, Inc. Plans to Separate from Ashford University, Improve Access to High-Quality Education" announcing the Company's "plans to separate from its academic institutions, Ashford University and University of the Rockies, and become an Online Program Management (OPM) company." It continued:

> In addition, Ashford University has submitted an application to the
> WASC Senior College and University Commission (WSCUC) to
> merge with University of the Rockies, its sister institution, and to
> return to an independent, non-profit university. Pending these and
> other necessary approvals, the merged institution of Ashford
> University and University of the Rockies intends to negotiate a
> services agreement to become Bridgepoint Education's first client as
> an OPM.

"This transformation marks the next phase in the missions of both Bridgepoint and Ashford University and is a strategic decision that leadership has been considering and thoughtfully evaluating for quite some time," said Andrew Clark, CEO and president of Bridgepoint Education.

Demand for non-traditional education solutions is growing, and institutions of higher learning are looking to meet the wide-ranging needs of today's learners. As an OPM, Bridgepoint Education will seek to help colleges and universities adapt to emerging technological innovations, shifts in student demographics, and changing expectations regarding the role of higher education in supporting workforce development.

As part of this change, University of the Rockies will also merge with Ashford University, its sister institution. The doctoral programs offered by University of the Rockies will become a new doctoral college within Ashford University. University of the Rockies master's programs will be integrated into Ashford's existing colleges. The addition of University of the Rockies' graduate level social and behavioral sciences programs will enable Ashford University to reach a wider array of students and help close the skills gap faced by employers.

"We are proud of what Bridgepoint Education, Ashford University and University of the Rockies have accomplished and believe that together we have served an essential public purpose," said Clark. "We believe the innovative, student-focused education we have provided has allowed thousands of students to earn a university degree-many of whom might not have enjoyed that opportunity otherwise. In today's dynamic higher education environment, we believe this transformation will permit us to continue to pursue our mission in new and exciting ways."

## Bridgepoint's Accounting During the Class Period

### Government Investigations Force the Company to Restate its Financials Due to Revenue Recognition Problems

106.    In 2014, the SEC heightened its scrutiny regarding Bridgepoint's accounting practices, especially with respect to revenue recognition and receivables. Ultimately, the SEC

34

forced Bridgepoint not only to promise to change its revenue recognition practices going forward, but also to restate its 2013 financial statements.

107.    Under GAAP, as detailed above, revenue cannot be properly recognized if its collectibility is not reasonably assured. But Bridgepoint had been blindly basing this determination of collectibility for many of its students based on the *government's* ability to pay, reasoning that Bridgepoint students will most likely be eligible for federal student loans—even though the Company knew, and admitted, that not every student was receiving financial aid, and not all of Bridgepoint's revenue was actually collected from the government. Bridgepoint also admitted that they were able, using their internal tracking systems and mechanism, to identify students with and without financial aid, and that students without financial aid were less likely to pay their owed tuition and fees—the latter fact of which was especially critical to ensuring proper revenue recognition under ASC 605.

108.    Nevertheless, Bridgepoint's accounting practices made no distinction as to students with financial aid funding and those without—treating them all as equivalent in terms of collectability—while also failing to reconcile whether revenue recognition was still appropriate if or when a student dropped out of or became ineligible for the program (which altered the party who was responsible for ultimate payment). As Bridgepoint admitted in a February 24, 2014 letter to the SEC, Bridgepoint "ha[d] not done a formal analysis to separate collection rates of students with and without financial aid funding" and "the Company's accounts receivable system does not separate or categorize students with and without financial aid funding."

109.    Only after the SEC prodded Defendants for months did Bridgepoint take the necessary steps to address its accounting for revenues and accounts receivable on a student-by-student basis, which ultimately included restating prior period financial statements for its failure to have done so properly.

110.    Investors started to learn some details on May 12, 2014, when CFO Daniel J. Devine stated on an earnings call that Bridgepoint had been recognizing revenues for students that subsequently lost financial aid eligibility, and that when that revenue was not collected—as

was to be expected—it was later written off as a bad debt expense. In relevant part:

> We have determined that we will be unable to file our quarterly report on Form 10-Q for the quarter ended March 31, 2014, by the filing deadline of May 12, 2014. We are working to quantify the impact of an outstanding comment the company received from the Securities and Exchange Commission, or SEC. **The comment was received in connection with the SEC's review of the company's periodic reports and relates to the company's revenue recognition and accounting for doubtful accounts. Specifically, the company has historically not determined it necessary to reassess whether collectibility is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the company's institutions**. On May 2, 2014, the SEC informed the company that such a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances such as when a student loses financial aid eligibility. **Based on our internal analysis to date, management has preliminarily estimated that the application of the student-by-student reassessment during the quarter ended March 31, 2014, resulted in a decrease in revenue and bad debt of $0.7 million and $0.2 million, respectively.** These adjustments are reflected in the preliminary results contained in this presentation. However, our analysis is not complete, and these adjustments and the preliminary results may change. The company is also evaluating whether a lack of student-by-student reassessment either changes management's assessment of the effectiveness of the company's internal control over financial reporting as of December 31, 2013; or caused a previously issued quarter or annual financial statements for the periods from January 1, 2011, through December 31, 2013, to be materially misstated. At this time, management is unable to conclude whether any previously issued financial statements are materially misstated. In the event any prior period is materially misstated, the financial statements for such period and those of subsequent periods will be required to be restated in an amendment to our annual report on Form 10-K for the year December 31, 2013. Even if no prior period financial statements are materially misstated, our previously issued financial statements and our results for the quarter ended March 31, 2014, may be required to be revised on a prospective basis.

> **Under the previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility and ultimately not collected were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters**.

(Emphasis added.)

111.  On May 30, 2014, the Company announced that the restatement of prior period financial statements would occur, for the years 2011 through 2013.

112.  On July 25, 2014, Bridgepoint disclosed that it had received from the SEC a subpoena relating to certain of its accounting practices, including revenue recognition and receivables, and that the SEC had "requested documents and detailed information for the time period January 1, 2009 to present."

113.  On August 4, 2014, Bridgepoint issued a restatement of its financial results for 2013 and the first three quarters thereof. The 2013 10-K/A described the restatement as follows:

> **Restatement/Revision of Previously Issued Consolidated Financial Statements**
>
> The Company is restating its consolidated balance sheet as of December 31, 2013, and its consolidated statement of income, consolidated statement of comprehensive income, consolidated statement of stockholders' equity and consolidated statement of cash flow for the year ended December 31, 2013, as well as the quarterly periods during that fiscal year. The Company is also revising its consolidated balance sheet as of December 31, 2012, and its consolidated statements of income, consolidated statements of comprehensive income, consolidated statements of stockholders' equity and consolidated statements of cash flow for the years ended December 31, 2012 and 2011, as well as for all the quarterly periods included in 2012.
>
> During the reporting of the first quarter of 2014, as part of a comment letter process with the Securities and Exchange Commission ("SEC"), the Company identified misapplications of GAAP as it related to the **accounting for revenue recognition** and the classification of restricted cash. **Specifically on the revenue recognition, the process for analyzing the collectibility assertion was not designed to**

37

**reassess collectibility on a student-by-student basis throughout the period revenue was recognized by the Company's institutions. As a result, the Company has changed its revenue recognition policy and has identified adjustments, relating to revenue, provision for bad debts, accounts receivable**, which should have been recognized during the prior periods, and restricted cash balances, which should have been presented differently during the prior periods.

(Emphasis added.).

114.    The 2013 10-K/A also included "Management's Restated Report on Internal Control Over Financial Reporting" which stated in relevant part:

Our management has concluded that there are two material weaknesses in internal control over financial reporting, as we did not maintain effective controls over the selection and application of GAAP related to revenue recognition and restricted cash. Specifically, the members of our management team with the requisite level of accounting knowledge, experience and training commensurate with our financial reporting requirements did not analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances. **One control deficiency related to our failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions. This control deficiency resulted in the misstatement of our revenue, bad debt expense, and accounts receivables and related financial disclosures**, and resulted in the restatement of the Company's consolidated financial statements for the year 2013 and each of the quarters of 2013 and revision of the Company's consolidated financial statements for the years 2012 and 2011 and each of the quarters of 2012 and 2011. The other control deficiency related to our failure to maintain effective internal controls over the presentation of certain funds as restricted cash. This control deficiency resulted in the misstatement of our cash and cash equivalents and restricted cash accounts, cash flow provided by operating activities on the consolidated statement of cash flows, and the related financial disclosures and resulted in the revision of the Company's consolidated financial statements for the years 2013, 2012,

and 2011 and each of the quarters of 2013, 2012, and 2011. Additionally, these control deficiencies could result in misstatements of the aforementioned accounts and disclosures that would result in a material misstatement of the consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that these control deficiencies constitute individual material weaknesses.

(Emphasis added.).

115.   To address these material weaknesses, the 2013 10-K/A stated as follows:

We plan to take additional measures to remediate the underlying causes of the material weaknesses. We plan to achieve this primarily through additional training efforts regarding reassessing the collectibility of funds owed by students during the period of revenue recognition and the definition of restricted cash by the members of management with the requisite level of knowledge, experience and training to appropriately apply GAAP. However, we have not completed all of the corrective processes, procedures and related evaluation or remediation that we believe are necessary. As we continue to evaluate and work to remediate the material weaknesses, we may determine to implement measures to address the control deficiencies. The actions that we are taking are subject to ongoing senior management review, as well as audit committee oversight.

**Bridgepoint Takes Years Before Purporting to Fix its Material Weakness**

116.   Although Bridgepoint pledged in the 2013 10-K/A "to take additional measures to remediate the underlying causes of the material weaknesses," those material weaknesses persisted for years.

117.   By March 10, 2015, Bridgepoint stated in its 2014 10-K that it still had a "material weakness in internal control over financial reporting surrounding our failure to maintain effective internal controls over the accounting for revenue recognition"—specifically, that Bridgepoint "did not maintain effective controls surrounding the selection and application of GAAP related to revenue recognition as of December 31, 2014"—that "could result in misstatements of revenue, bad debt expense, accounts receivables and the related financial disclosures that would result in a material misstatement of the consolidated financial statements

1    that would not be prevented or detected."

2        118.    Accordingly, the 2015 10-K stated as follows about the Company's remediation

3    efforts:

4        **Management's Remediation Plan**

5        We are committed to remediating the control deficiencies that
         constitute the above remaining material weakness by implementing
6        changes to our internal control over financial reporting. Management
         is responsible for implementing changes and improvements in the
7        internal control over financial reporting and for remediating the
8        control deficiencies that gave rise to the material weakness.

9        We plan to implement measures to remediate the underlying causes of
10       the control deficiencies that gave rise to the material weakness. We
         plan to achieve this primarily through additional training efforts as
11       well as ensuring appropriate review of the related significant
12       accounting policies by the members of management with the requisite
         level of knowledge, experience and training to appropriately apply
13       GAAP. We plan to undertake additional review processes to ensure the
14       related significant accounting policies are implemented and applied
         properly on a consistent basis throughout the Company. We believe
15       these measures will remediate the control deficiencies. However, we
16       have not completed all of the corrective processes, procedures and
         related evaluation or remediation that we believe are necessary. As we
17       continue to evaluate and work to remediate the control deficiencies
18       that gave rise to the material weakness, we may determine to take
19       additional measures to address the control deficiencies.

20       **Prior Material Weakness and Remediation**

21       In regards to the prior material weakness surrounding the selection and
         application of GAAP related to restricted cash, we implemented
22       measures and new controls throughout the year and have remediated
23       the control deficiencies that constituted that prior material weakness
         by implementing changes to our internal control over financial
24       reporting. These measures include the following:

25           • The Company has implemented controls to help ensure that
26           employees with a proper knowledge of GAAP are in place;

27

28

> • To address the level of knowledge in the specific areas noted, members of our accounting and finance team have attended training in the specific areas;
>
> • To address the design deficiency surrounding the selection and application of GAAP, the Company implemented a new control surrounding Financial Statement Risk Assessment;
>
> • The Company enhanced procedures to ensure appropriate review of accounting policies specific to treasury processes.
>
> Based on the remediation measures tested, which were found to be operating effectively, the Company concluded that the material weakness relating to the selection and application of GAAP related to restricted cash was remediated as of December 31, 2014.

119.   Meanwhile, Bridgepoint faced increasing regulatory scrutiny. On August 10, 2015, the Company received Civil Investigative Demands from the Consumer Financial Protection Bureau "related to the CFPB's investigation to determine whether for-profit post-secondary education companies or other unnamed persons have engaged in or are engaging in unlawful acts or practices related to the advertising, marketing or origination of private student loans." On December 10, 2015, the Company received a "request for information from the Multi-Regional and Foreign School Participation Division of the [Department of Education Office of Federal Student Aid] for (i) advertising and marketing materials provided to prospective students regarding the transferability of certain credit, (ii) documents produced in response to the CFPB's August 10, 2015 Civil Investigative Demand related to the CFPB's investigation to determine whether for-profit post-secondary education companies or other unnamed persons have engaged in or are engaging in unlawful acts or practices related to the advertising, marketing or origination of private student loans, (iii) certain documents produced in response to subpoenas and interrogatories issued by the California Attorney General and (iv) records created between 2009 and 2012 related to the disbursement of certain Title IV funds."

120.   Yet *as late as March 2, 2016*—when it filed its 2015 10-K—the Company still had to tell investors that "there were material weaknesses in our internal control over financial reporting as of December 31, 2015, as we did not maintain effective controls over the

41

accounting for revenue recognition."

121.   The 2015 10-K even mentioned a new material weakness that was not mentioned in the 2014 10-K—specifically, that the Company "also did not maintain effective controls to assess the reliability of system generated data used in the operation of certain revenue recognition controls."

122.   As for remediation, the 2015 10-K stated:

> We plan to implement measures to remediate the underlying causes of the control deficiencies that gave rise to the material weaknesses. These measures include the hiring of new accounting personnel, as well as providing additional training for existing personnel. These measures also include the implementation of financial reporting risk assessments and review processes to ensure the related significant accounting policies are implemented and applied properly under GAAP on a consistent basis through the Company. We plan to perform a review of all key reports utilized in the revenue and receivable cycle to ensure appropriate controls are in place over the completeness and accuracy of the underlying data used in these key reports. We have also established enhanced procedures to ensure appropriate review of accounting policies by the members of our management team with the requisite level of accounting knowledge, experience and training.
>
> However, we have not completed all of the corrective processes and procedures and the related evaluation or remediation that we believe are necessary. As we continue to evaluate and work to remediate the material weaknesses, we may determine to implement additional measures to address the underlying control deficiencies. The actions we are taking to remediate the material weaknesses are subject to ongoing senior management review, as well as oversight by the audit committee of our board of directors.

123.   The Company thus faced significant pressure in early 2016 to assure investors and regulators that it was addressing these internal control problems.

124.   On March 24, 2016, Bridgepoint announced that it had "dismissed PricewaterhouseCoopers, LLP ("PwC"), the independent registered public accounting firm previously engaged to audit the Company's financial statements, effective immediately" and "approved the appointment of Deloitte & Touche LLP ("Deloitte") as the Company's

42

independent registered public accounting firm for the fiscal year ending December 31, 2016 and the interim quarterly periods beginning with the quarter ending March 31, 2016."[9]

125.    But regulatory scrutiny continued to increase. On May 18, 2016—only weeks after filing its 2015 10-K—the SEC expanded its investigation of Bridgepoint to include the Company's "scholarship and institutional loan programs and any other extensions of credit made by the Company to students, and student enrollment and retention at the Company's academic institutions" from as early as January 1, 2014.[10] In a Form 8-K issued on Mary 24, 2016, the Company stated as follows:

> Bridgepoint Education, Inc. (the "Company") previously disclosed that it received from the U.S. Securities and Exchange Commission (the "SEC") a subpoena, dated July 22, 2014 (the "July 2014 Subpoena"), seeking information with respect to certain of the Company's accounting practices, including revenue recognition, receivables and other matters relating to the Company's restatement of its financial statements for the fiscal year ended December 31, 2013 and revision of its financial statements for the fiscal years ended December 31, 2011 and 2012. The July 2014 Subpoena requested documents and detailed information for the time period January 1, 2009 to present. The Company has been cooperating with the SEC on this matter.
>
> On May 18, 2016, the Company received a second subpoena from the SEC (the "May 2016 Subpoena") seeking additional information from the Company, including information with respect to the $13.9 million accrual disclosed by the Company in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 with respect to the potential joint resolution of investigations by the Attorney General of the State of California and the Consumer Financial Protection Bureau (the "CA AG/CFPB Investigations"), *the Company's scholarship and institutional loan programs and any other extensions of credit made by the Company to students, and student enrollment and retention at*

[9] According to FE1 (see below), the Company fired PwC precisely because PwC discovered the internal control problems concerning the FTG program and informed the Company.

[10] According to FE1 (see below), the SEC's subpoena regarding "the Company's scholarship and institutional loan programs" concerned the same internal control problems that ultimately necessitated the 2019 restatement, which had existed as far back as 2013.

43

> *the Company's academic institutions*. Pursuant to the May 2016
> Subpoena, the SEC has requested from the Company documents and
> detailed information for, in the case of the CA AG/CFPB
> Investigations, the periods at issue in such investigations, *in the case*
> *of the Company's scholarship and institutional loan programs and*
> *related matters, the period from January 1, 2011 to the present, and*
> *for all other matters, the period from January 1, 2014 to the present.*
> The Company is evaluating the May 2016 Subpoena and intends to
> fully cooperate with the SEC on this matter.

(Emphases added.)

126.    On July 12, 2016, Bridgepoint announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act."

127.    Not until March 7, 2017 did the Company announce that it had fixed its material weaknesses. Specifically, it stated in its 2016 10-K:

> We committed to remediating the control deficiencies that gave rise to
> the material weaknesses by implementing changes to our internal
> control over financial reporting. Management is responsible for
> implementing changes and improvements in our internal control over
> financial reporting and for remediating the control deficiencies that
> gave rise to the material weaknesses.
>
> *We have implemented measures to remediate the control deficiencies*
> *that gave rise to the material weaknesses*. These measures include the
> hiring of new accounting personnel, provision of additional training to
> new and existing personnel, and implementation of financial reporting
> risk assessments and review processes to ensure significant accounting
> policies are implemented and applied properly under GAAP on a
> consistent basis throughout the Company. We performed a review of
> all key reports utilized in the revenue and receivable cycle to ensure
> appropriate controls are in place over the completeness and accuracy
> of the underlying data used in these key reports. We have also
> established enhanced procedures to ensure appropriate review of
> accounting policies by the members of our management team with the
> requisite level of accounting knowledge, experience and training.

44

> ***We believe the above measures have enabled us to remediate the
> control deficiencies that gave rise to the material weaknesses.*** We
> will continue to maintain appropriate focus on this critical
> accounting area going forward. We ***believe these measures have remediated the
> identified control deficiencies and strengthen internal control over
> financial reporting***.

### However, the Company Had Not In Fact Fixed its Internal Controls

128.    Contrary to Defendants' claim in the 2016 10-K that the Company "ha[d]
remediated the identified control deficiencies," it still had material weaknesses, as investors
later learned on March 7, 2019.

129.    Former Employee 1 worked at PricewaterhouseCoopers from 2010-2013, during
which time FE1 was on the engagement team charged with auditing Bridgepoint's financial
statements. Later, from 2016 to 2017, FE1 was hired by Bridgepoint and focused on revenue
recognition issues at the Company.

130.    According to FE1, Bridgepoint routinely accelerated revenue recognition after
"anticipating they would make money they would not make." According to FE1, the internal
control problems that necessitated the 2019 restatement had existed as far back as 2013. The
SEC was interested in exactly this problem when it requested information concerning "the
Company's scholarship and institutional loan programs and related matters, the period from
January 1, 2011 to the present" in its May 18, 2016 subpoena.

131.    Moreover, according to FE1, even though the FTG program was structured
totally differently from the Company's usual course offerings, Bridgepoint kept using its old
accounting software, which was not configured adequately for revenue that was customized, and
refused to upgrade or configure it so that it could properly track revenues from the FTG
program.

132.    According to FE1, Bridgepoint typically charged $1,400 per class. But in order to
convince corporations to sign up for the FTG program, specifically, Bridgepoint had to offer
"many concessions" including deep discounts, and it ultimately reached totally different
agreements with each corporation. As a result, Bridgepoint had deals with hundreds of

45

companies and their contracts were all very customized.

133.    Nevertheless, according to FE1, when recognizing revenue in connection with the FTG program, Bridgepoint ignored the contracted price, recorded a fixed amount ($1,400) in deferred revenue, and then did a "patchwork fix" by booking a "some kind of scholarship that would net against the revenue." This was improper because the contract price was nearly always less than $1,400. Thus, Bridgepoint "lost visibility of how scholarships were being recorded."

134.    According to FE1, Defendants knew about the control problem because PwC discovered the problem and informed the Company, after which the Company fired PwC on March 24, 2016 and hired Deloitte instead as its auditor.

135.    In addition, according to FE1, Defendant Royal pressured FE1 and others to sign off on calculations they lacked the knowledge to approve. FE1 warned Associate Vice President of Accounting Jose Alberto Mendoza, as well as Chief Accounting Officer and Corporate Controller Steve Burkholder, about FE1's concerns with the accounting process for the FTG program, and refused to sign off on some internal controls related to it.

# Defendants' False and Misleading Statements During the Class Period

## 2015 10-K

136.    The Class Period begins on March 8, 2016, when Bridgepoint filed its annual report on Form 10-K for 2015 (the "2015 10-K"). For 2015, Bridgepoint reported a net loss of $70.45 million, or $1.54 per diluted share, on net revenue of $561.73 million, compared to net income of $9.67 million, or $0.21 per diluted share, on net revenue of $638.71 million for 2014. Additionally, the 2015 10-K reported a provision for bad debts of $29.86 million, accounts receivable of $34.21 million with net accounts receivable of $24.09 million (less allowance for doubtful accounts of $10.11 million), deferred revenue of $23.31 million, and total costs and expenses of $604.02 million.

137.    The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX"), in which Defendants Clark and Royal certified that the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

<u>**2016 10-K**</u>

138.   On March 7, 2017, Bridgepoint filed its annual report for 2016 (the "2016 10-K"). For 2016, Bridgepoint reported a net loss of $30.04 million, or $0.65 per diluted share, on net revenue of $527.09 million, compared to a net loss of $70.45 million, or $1.54 per diluted share, on net revenue of $561.73 million for 2015. Additionally, the 2016 10-K reported a provision for bad debts of $32.58 million, accounts receivable of $42.61 million with net accounts receivable of $26.46 million (less allowance for doubtful accounts of $16.15 million), deferred revenue of $21.73 million, and total costs and expenses of $567.31 million.

139.   The 2016 10-K was also false and misleading in that it represented that the Company had "implemented measures to remediate the control deficiencies that gave rise to the material weaknesses" and thereby "remediated the identified control deficiencies." Specifically, the 2016 10-K stated:

> We committed to remediating the control deficiencies that gave rise to the material weaknesses by implementing changes to our internal control over financial reporting. Management is responsible for implementing changes and improvements in our internal control over financial reporting and for remediating the control deficiencies that gave rise to the material weaknesses.
>
> ***We have implemented measures to remediate the control deficiencies that gave rise to the material weaknesses***. These measures include the hiring of new accounting personnel, provision of additional training to new and existing personnel, and implementation of financial reporting risk assessments and review processes to ensure significant accounting policies are implemented and applied properly under GAAP on a consistent basis throughout the Company. We performed a review of all key reports utilized in the revenue and receivable cycle to ensure appropriate controls are in place over the completeness and accuracy

47

of the underlying data used in these key reports. We have also established enhanced procedures to ensure appropriate review of accounting policies by the members of our management team with the requisite level of accounting knowledge, experience and training.

***We believe the above measures have enabled us to remediate the control deficiencies that gave rise to the material weaknesses.*** We will continue to maintain appropriate focus on this critical accounting area going forward. We ***believe these measures have remediated the identified control deficiencies and strengthen internal control over financial reporting***.

140.   The 2016 10-K also falsely represented that Bridgepoint's disclosure controls and procedures, as well as internal control over financial reporting, were effective, stating, in relevant part:

We maintain disclosure controls and procedures, as defined in Rule 13a- 15(e) and Rule 15d-15(e) under the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

Under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer, we carried out an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15(b) and Rule 15d-15(b) of the Exchange Act. Based on this evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2016.

\* \* \*

48

Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements prepared for external purposes in accordance with GAAP.

\* \* \*

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 based on the framework set forth in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

141.    The 2016 10-K also contained merely generic, boilerplate representations with respect to Bridgepoint's risk of error relating to its disclosure controls and procedures, as well as internal control over financial reporting, stating, in relevant part:

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of any possible controls and procedures.

\* \* \*

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of the effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

142.    The 2016 10-K contained signed SOX certifications in which Defendants Clark and Royal certified that the 2016 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## 2017 10-K

143.     On February 21, 2018, Bridgepoint filed its annual report on Form 10-K for 2017 (the "2017 10-K"). For 2017, Bridgepoint reported net income of $10.54 million, or $0.32 per diluted share, on net revenue of $478.40 million, compared to a net loss of $30.04 million, or $0.65 per diluted share, on net revenue of $527.09 million for 2016. Additionally, the 2017 10-K reported a provision for bad debts of $32.15 million, accounts receivable of $44.66 million with net accounts receivable of $27.078 million (less allowance for doubtful accounts of $17.58 million), deferred revenue of $19.14 million, and total costs and expenses of $470.55 million.

144.     The 2017 10-K also discussed Bridgepoint's FTG program and touted its contribution to Bridgepoint's total enrollment, stating, in relevant part:

> ***One area in which we are experiencing positive enrollment trends*** is within our Education Partnerships programs with various employers. These corporate partnership programs provide companies with the opportunity to offer their employees a way to pursue and complete a college degree without incurring any student debt. Enrollments in the Corporate Full Tuition Grant ('FTG') program is approximately 10% of our total enrollment as of December 31, 2017, compared to approximately 6% of our total enrollment as of December 31, 2016. Revenue derived from Education Partnerships is cash pay, and is therefore not considered federal student aid for purposes of calculations under the 90/10 rule.
>
> * * *
>
> Certain scholarships, such as the Corporate Full Tuition Grant ('FTG') and Alumni Scholarship are recognized against revenue over the period of benefit to the student.

145.     With respect to the effectiveness of Bridgepoint's disclosure controls and procedures, as well as internal control over financial reporting, the 2017 10-K contained statements substantively identical to the statements in the 2016 10-K referenced above.

146.     Likewise, the 2017 10-K contained general and boilerplate representations concerning Bridgepoint's risk of error relating to its disclosure controls and procedures, as well as internal control over financial reporting, substantively identical to the statements in the

Company's 2016 10-K referenced above.

147.     The 2017 10-K contained signed SOX certifications in which Defendants Clark and D'Amico certified that the 2017 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## 2018 Q1 10-Q

148.     On May 1, 2018, Bridgepoint filed its quarterly report for the first quarter of 2018 (the "2018 Q1 10-Q"). The Company reported net income of $2.30 million, or $0.08 per diluted share, on net revenue of $118.03 million for the quarter, compared to net income of $9.87 million, or $0.23 per diluted share, on net revenue of $129.49 million for the same quarter 2017. Additionally, the Company reported a provision for bad debts of $6.65 million, accounts receivable of $47.02 million with net accounts receivable of $33.59 million (less allowance for doubtful accounts of $13.43 million), deferred revenue of $22.97 million, and total costs and expenses of $117.65 million.

149.     The 2018 Q1 10-Q contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q1 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [1Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## 2018 Q2 10-Q

150.     On July 25, 2018, Bridgepoint filed its quarterly report for the second quarter of 2018 (the "2018 Q2 10-Q"). The Company reported net income of $17.23 million, or $0.63 per diluted share, on net revenue of $120.83 million for the quarter, compared to net income of $6.31 million, or $0.21 per diluted share, on net revenue of $124.58 million for the same quarter 2017. Additionally, the Company reported a provision for bad debts of $11.71 million, accounts

receivable of $48.57 million with net accounts receivable of $34.06 million (less allowance for doubtful accounts of $14.51 million), deferred revenue of $20.26 million, and total costs and expenses of $109.28 million.

151.    The 2018 Q2 10-Q contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q2 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## 2018 Q3 10-Q

152.    On November 8, 2018, Bridgepoint filed its quarterly report for the third quarter of 2018 (the "2018 Q3 10-Q"). The Company reported net income of $4.31 million, or $0.16 per diluted share, on net revenue of $114.86 million for the quarter, compared to net income of $39.00 thousand, or $0.00 per diluted share, on net revenue of $119.37 million for the same quarter 2017. Additionally, the Company reported a provision for bad debts of $18.54 million, accounts receivable of $49.23 million with net accounts receivable of $33.57 million (less allowance for doubtful accounts of $15.67 million), deferred revenue of $17.86 million, and total costs and expenses of $111.33 million.

153.    The 2018 Q3 10-Q contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q3 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## Why All These Statements Were Materially False and Misleading

154.    The statements referenced above were materially false and misleading because (i) Defendants were reckless in designing and/or employing the Company's processes for recording revenue, deferred revenue, accounts receivable, and bad debt expense for its FTG

52

program in a manner that violated GAAP, SEC regulations, and its own stated revenue recognition policy; (ii) Bridgepoint failed to maintain effective internal controls over financial reporting; and (iii) due to the foregoing deficiencies, Bridgepoint made material accounting errors related to deferred revenue, accounts receivable, and its provision for bad debts in its financial statements during the Class Period—most significantly, Bridgepoint's financial statements for the first three quarters of 2018 overstated revenue by $5.06 million and overstated net income by $5.78 million—which violated GAAP, SEC regulations, and its own stated revenue recognition policy and thus rendered Bridgepoint's financial statements for the Class Period "misleading or inaccurate" under 17 C.F.R. § 210.4-01(a)(1).

### The Truth Begins to Emerge

### The March 7, 2019 8-K and the Restatement

155.    Bridgepoint did, in fact, have issues with the way it was accounting for its revenues, deferred revenues, accounts receivable (including its allowance for doubtful accounts where applicable) and bad debt expense under, among other accounting principles, ASC 606.

156.    On March 7, 2019, Bridgepoint filed a current report on Form 8-K (the "Restatement 8-K") announcing that it had "determined to restate the Company's previously issued unaudited condensed consolidated financial statements, and advised that those financial statements should not be relied upon, for the three and nine months ended September 30, 2018." Bridgepoint stated that the processes used for recording revenue for the FTG program portion of its student contracts "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses. Bridgepoint also identified material weaknesses in its system of internal controls over financial reporting.

157.    Specifically, the Restatement 8-K stated, in relevant part:

> **Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

53

On March 6, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of Bridgepoint Education, Inc. (the "Company") concluded that the Company's previously issued unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2018 (the "Restated Periods"), should no longer be relied upon because of errors. Additionally, the Company's earnings and press releases and similar communications to the extent that they relate to our financial statements for the Restated Periods should no longer be relied upon.

**Specifically, during the preparation of the 2018 annual consolidated financial statements, the Company determined that the process used for recording the revenue for the Full Tuition Grant program portion of our student contracts and the related judgments and estimates were not designed with sufficient precision**. As a result, the Company identified errors, relating to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses for the Restated Periods. The errors described above were material to the Restated Periods and will be corrected in the restatement of our financial statements for the Restated Periods.

The Company plans to restate its unaudited condensed consolidated financial statements for the Restated Periods discussed above by filing an amended Form 10-Q for the period ended September 30, 2018 (the "Amended Form 10-Q"). As similar errors described above existed in earlier periods, but were not considered material, the Company plans to reflect the correction of such immaterial errors for the years ended December 31, 2016 and 2017 (and related quarterly periods therein), as well as the first and second quarters of 2018 (the "Revised Periods"), in the Amended Form 10-Q and prospectively as it issues subsequent filings. Adjustments prior to December 31, 2015 will be adjusted through the retained earnings balance as of January 1, 2016, as the adjustments in those periods were not considered material.

In addition, the Company has subsequently identified two material weaknesses in internal control over financial reporting related to 1) control design in the accounting for revenue related to the Full Tuition Grant program and 2) operation of review controls over unusual or non-recurring and significant transactions.

Our management has re-evaluated its assessment of our disclosure controls and procedures and internal control over financial reporting as

54

of September 30, 2018 and concluded that each was ineffective as of that date due to the existence of the material weaknesses. As part of our Amended Form 10-Q, we will update and reflect the restatement of our financial statements for the Restated Periods and the change in management's conclusion regarding the effectiveness of our disclosure controls and procedures and internal control over financial reporting as of September 30, 2018. As a result, we will not file our Form 10-K for the year ended December 31, 2018 (the "Form 10- K") until after the filing of the Amended Form 10-Q.

We expect that certain amounts in the condensed consolidated financial statements for the Restated Periods, which will be included in the Amended Form 10-Q, to differ from the amounts reported in the original filing. Revenue, as restated, for the nine month period ended September 30, 2018 is expected to be in a range of approximately $347.2 million to $348.7 million. Net income, as restated, for the nine month period ended September 30, 2018 is expected to be in a range of approximately $17.6 million to $18.1 million. However, the restatement effects discussed herein are preliminary and subject to further assessment prior to the filing of the Amended Form 10-Q. We do not anticipate any material changes to our financial statements for the Revised Periods.

(Emphasis added.).

158.   On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume.

159.   On March 12, 2019, Bridgepoint explained the restatement in its 2018 Q3 10-Q/A as follows:

For the three and nine months ended September 30, 2018, the Company determined that such financial statements had errors related to (i) *revenue for the Full Tuition Grant program* portion of our student contracts which was misstated due to *allowances that had not been properly determined* and *computational errors*, which also resulted in *misstatements in accounts receivable and its provision for bad debts, deferred revenue and student deposits*, and the related income tax impact; (ii) classification error of $5.7 million between restricted cash and other long term-assets as of September 30, 2018 related to a long-term letter of credit issued as collateral for the build-to-suit lease, and (iii) a *misstatement in the adjustment to beginning*

> ***retained earnings*** as of January 1, 2018 as a result of the incorrect
> adoption of ASU 2014-09, Revenue from Contracts with Customers,
> or Accounting Standards Codification Topic 606 ("ASC 606") ***as it***
> ***relates to the Full Tuition Grant Program, resulting in a decrease of***
> ***$2.2 million*** from the amount previously reported of $3.2 million to
> $1.0 million , as restated.

(2018 Q3 10-Q/A, p. 9; emphasis added.).

160.    As seen in the disclosures above, the misstatement and resulting errors from the improper accounting for the FTG program caused several financial line items on Bridgepoint's financial statements to be materially misstated for the first three quarters in 2018. The 2018 Q3 10-Q/A reflects the following misstatements, centered on by Bridgepoint's incorrect accounting for its FTG program, for the nine months then ended: net income decreased by $5.8 million ($23.8M to $18.05M), revenue decreased $5 million ($353.7M to $348.7M), accounts receivable decreased by $4.7 million ($33.57M to $28.9M), and deferred revenue and student deposits (a liability account) increased by $4.5 million ($53.87M to $58.4M).

161.    The issues that led to the Restatement, including ongoing material weaknesses in internal control, also mirrored in many respects the accounting issues that led to the 2013 Restatement (and a restatement for 2012).

### **The 2018 10-K**

162.    On March 12, 2019, Bridgepoint filed its annual report on Form 10-K for 2018 (the "2018 10-K"), which told investors that other prior period financial statements (i.e., 2017, and 2016, and for 2015 and prior) also contained misstatements attributable to the same improper accounting "for the Full Tuition Grant program portion of [its] student contracts," stating again that it was "due to allowances that had not been properly determined [as well as] computational errors … in accounts receivable and its provision for bad debts and deferred revenue and student deposits." (2018 10-K, p. 66). The following reflects the impact of these errors, in 2017 alone: net income decreased by $1.4 million ($10.5M to $$9.1M), revenue decreased by $3.4 million ($478.4M to $475M), accounts receivable decreased by $2.8 million

56

($27M to $24.2M), and the liability account "deferred revenue and student deposits" increased by $2.8 million ($68M to $70.8M).

163.   Following this filing, Bridgepoint's stock price fell once again, declining from $7.00 on March 12, 2019 at close to $6.90 at close on March 13, 2019.

164.   Based on the various disclosures made by the Company in connection with the restatements, it is apparent that the Company improperly reported its revenue (as well as the other accounts referenced in the disclosure) as a result of the improper accounting for its FTG program. These errors emanated directly from the Company's failure to properly consider in its financial statements the impact of students that had dropped out of or become ineligible for its various programs, including the FTG program, and, specifically, how such events impacted the collectability of student tuition, which impacted the proper accounting for such transactions and events in view of ASC 606 (for 2018) and ASC 605 for all prior periods.

165.   In connection therewith, the Company also determined – and disclosed – that there were material weaknesses in its system of internal controls over financial reporting, which caused or allowed the misstatements to occur. Such disclosures provide additional information about how the accounting for the FTG program was not in conformity with GAAP.

### *Bridgepoint's Material Weakness in Internal Control and its Restatements*

166.   In its 2018 10-K, and in view of its restatement for the three and nine months ended September 30, 2018 (as well as cumulative effect adjustments to retained earnings for prior periods), Bridgepoint disclosed that it had identified a material weakness in its internal controls over financial reporting as of December 31, 2018, relating, specifically, to the following:

> [Its] control design in the accounting of the student contracts for the Full Tuition Grant program whereby revenue was misstated due to allowances that had not been properly determined and contained computational errors, which also resulted in misstatements in accounts receivable and its provision for bad debts and deferred revenue and student deposits.

(2018 10-K, p. 100)

167.  The Company explained this material weakness, and that the restatement of its financial statements, resulted from management incorrectly applying ASC 606 upon adoption on January 1, 2018 "as it relates to the Full Tuition Grant Program, specifically the time period for which to recognize revenue in 2018 related to **Full Tuition Grant students** that **became inactive**." (2018 10-K, p. 101; emphasis added).

168.  The 2018 10-K also provided the following remediation plan:

**Management's Remediation Plan**

We are committed to remediating the material weaknesses by implementing changes to our internal control over financial reporting. Our Principal Financial Officer is responsible for implementing changes and improvements in internal control over financial reporting and for remediating the control deficiencies that gave rise to the material weaknesses.

We plan to implement measures to remediate the underlying causes of the control deficiencies. We plan to achieve this primarily through the following:

• improving the internal communication procedures between operations and accounting personnel;

• *enhancing our controls over the Full Tuition Grant accounting models, including more detailed steps to evaluate and revise critical assumptions and estimates to be more precise*;

• implementing enhanced analytical controls to *compensate for the manual processes*;

• technical accounting training for key financial management; and

• engaging external consultants, as needed, to provide support related to more complex applications of GAAP related to nonrecurring transactions and new accounting standards.

(2018 10-K, p. 101).

169.  In particular, Bridgepoint needed to enhance its "controls over the Full Tuition Grant." As discussed above, Bridgepoint had not properly estimated the amount of students that had become inactive in its FTG program specifically, and, therefore, had not properly recorded

its revenue and related offsets program during the Class Period, thereby misstating various accounts in its Class Period financial statements.

170.    As Bridgepoint noted in its disclosure regarding material weaknesses in internal control, one contributing factor was the improper accounting for "Full Tuition Grant students that became inactive." If and when students became inactive, Bridgepoint would have needed, under ASC 606, to continuously measure how such events impacted the measure of net revenue, and properly adjust reported gross revenue to account for such. The purpose of an allowance, according to ASC 606, is to offset revenue with variable consideration, in the form of a price concession. This price concession must accurately reflect the proportion of gross revenue an entity does not expect to receive—in this case, the amount of tuition that would not be collected as a result of historical student withdrawals, terminations, drop-out rates, and the decreased probability of collection on outstanding amounts when the burden of payments falls to the student (as opposed to a corporate partner or the Federal government)—all of which would need to be reflected in Bridgepoint's financial statements with respect to reported revenue for the FTG program. To the extent Bridgepoint did not have accurate lists of students enrolled in the FTG program, or failed to sufficiently track terminations, inactive students, or drop-outs, and the impact such had on reported revenue under ASC 606, revenue (as well as accounts receivable, deferred revenue, etc.) would have been overstated, as acknowledged in the restatement.

171.    These errors did not just impact or relate to 2018, however, and cannot, therefore, be pinned on or relate solely to ASC 606. No, instead the eventual restatement included adjustments to revenue and related accounts for 2017, 2016, 2015, and prior periods. In fact, the impact of the adoption of ASC 606 on prior periods was specifically, and separately, included in an adjustment to retained earnings as of January 1, 2018. Any corrections to the accounts identified for periods preceding January 1, 2018 indicate that the Company was likely accounting for its FTG program, and necessary consideration of student drop-outs, students who had become inactive, or enrollment terminations, under legacy accounting rules (such as ASC 605) for the reasons discussed previously herein, including for the failure to sufficiently

consider when and if collectability of certain tuition amounts was reasonably assured.

172.    What is more, the identification of material weaknesses in internal controls for the year 2018 confirmed that, as FE 1 asserted, the Company had ultimately failed to sufficiently remediated its identified internal control deficiencies since as far back as 2013.

### 2016 and 2017 Restatements

173.    As stated above, Bridgepoint also disclosed in its 2018 10-K that it needed to restate its 2016 and 2017 financial statements as a result, once again, of "errors related to revenue for the Full Tuition Grant program portion of [its] student contracts which was misstated due to allowances that had not been properly determined [as well as] computational errors … in accounts receivable and its provision for bad debts and deferred revenue and student deposits." (2018 10-K, p. 66). In connection therewith, Bridgepoint also recorded a $1.0 million cumulative adjustment to retained earnings to its opening balance sheet as of January 1, 2016 for what it deemed "immaterial adjustments impacting 2015 and prior." (2018 10-K, p. 66).

174.    The disclosure above demonstrates that Bridgepoint did not only misapply ASC 606 upon adoption, according to its own disclosures, but had historical issues with accounting for its FTG program, as far back as prior to 2015. Such issues necessarily preceded adoption of ASC 606. The restatement for years 2016 and 2017 (as well as prior periods) indicates that Bridgepoint had improperly recorded revenue under the predecessor accounting rules as well. This is further demonstrated as true by the 2013 restatement and the then-ongoing SEC investigation into Bridgepoint's accounting for revenue and accounts receivable.

175.    In the event revenue was being recorded for students that had withdrawn or become inactive during the semester, and for which an allowance was not created and/or properly estimated from historical rates, similar to what appears to have caused the errors impacting the 2018 financial statements, GAAP would clearly indicate that such financial statements were misstated, as acknowledged by the restatement.

176.    According to Bridgepoint's accounting policy for revenue recognition, before the adoption of ASC 606, they "reassess[ed] collectability throughout the period … on a student-by-

student basis" (2017 10-K, p. 47). If Bridgepoint's internal controls were inadequate, and the Company could not accurately count the "active" students enrolled in the FTG program, then it would have proven difficult to properly assess collectability on a student-by-student basis, as well as to properly account for such in its financial restatements. Furthermore, Bridgepoint's disclosures were nebulous as to whether these allowances for uncollectable accounts were prepared using models on the portfolio of receivables, overall or with respect to specific students, on a granular level, which would prove tedious and require precise tracking of enrollment stats and the ability to pay for each and every student. In view of the Company's findings regarding a material weaknesses in internal control, including reference to "allowances that had not been properly determined and computational errors" it is apparent that no matter how the methodology was designed, it was not operating effectively with respect to proper accounting under GAAP. In other words, the Company's utterly deficient internal controls rendered it incapable of assessing collectability on a student-by-student basis—which resulted in Bridgepoint accelerating revenue recognition improperly.

177.    Accordingly, errors in Bridgepoint's Class Period financial statements appear to have emanated from its inability to report appropriate and "precise" estimates in the allowance it created for students who withdrew, were terminated, dropped-out of the FTG program, or could no longer pay for program costs that fell to them. Additionally, Bridgepoint did not maintain proper internal controls over financial reporting demonstrated by the material weakness in the Company's 2018 10-K. Bridgepoint also apparently did not sufficiently track the students who were "active" in this program, or whether its financial statements properly reflected this phenomenon. The foregoing caused or contributed to the Company failing to properly account for revenue, deferred revenue, accounts receivable, or bad debt expense, including significantly with respect to students enrolled in its FTG program throughout the Class Period.

178.    Although the Company most recently restated its quarterly financial statements in 2018 (in the 2018 Q3 10-Q/A), its issues with accounting for the FTP program are not new. In fact, as discussed above and as referenced in the Company's previously filed financial statements and the 2013 restatement, Bridgepoint has had historical issues with the accounting

for this program that date back to before 2015 (as disclosed in the Company's 2018 10-K). The financial statements during the Class Period were not prepared in accordance with GAAP, resulting in material errors in reported net income, among identified errors in the accounts otherwise discussed herein.

## Loss Causation

179.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities, and operated as a fraud or deceit on Class-Period purchasers of such securities.

180.     As the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of Company securities fell, as the prior artificial inflation came out of their respective prices. As a result of their purchases of the Company's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## Class Action Allegations

181.     Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired the Company's securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

182.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by the Company's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

183. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

184. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

185. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether Defendants violated the Exchange Act;

    b. Whether Defendants participated in and pursued the wrongful activities complained of herein;

    c. Whether Defendants' statements were materially false and misleading or omitted to state material facts about the Company;

    d. Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning the Company; and

    e. The extent of damages sustained by members of the Class and the appropriate measure of damages.

186. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

187. Defendants have acted on grounds generally applicable to the Class with respect

to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

188. The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

# Count I

## Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

189. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

190. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

191. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents

described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

192.    By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

193.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

194.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities at

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

195.     During the Class Period, the Company's securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

196.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

# Count II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

198.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

199.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false statements.

200.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

201.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

202.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

203.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

# **Prayer for Relief**

**WHEREFORE** Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

# **Jury Demand**

Plaintiffs demand trial by jury.

68

Dated: October 1, 2019

Respectfully submitted,

**POMERANTZ LLP**

/s/ Murielle J. Steven Walsh

Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

**POMERANTZ LLP**

Jennifer Pafiti
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone: 310-405-7190
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**

Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-229-8811
Email: pdahlstrom@pomlaw.com

*Attorneys for Lead Plaintiff Shiva Stein*

69