**POMERANTZ LLP**
Jennifer Pafiti
1100 Glendon Avenue
Suite 1558
Los Angeles, CA 90024
Telephone: 310-405-7190
Email: jpafiti@pomlaw.com

(*additional counsel on signature page*)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHIVA STEIN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 3:19-cv-460-WQH-AHG |
| v. | **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| BRIDGEPOINT EDUCATION, INC.; ANDREW S. CLARK; KEVIN ROYAL; and JOSEPH L. D'AMICO, | CLASS ACTION |
| Defendants. | |

{00356768;36 }

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Factual Statement ........................................................................................................3

I.      The Company's Enrollment and Regulatory Problems Worsen before the Class Period ..........................................................................................................3

II.     The SEC Forces Bridgepoint to Change its Revenue Recognition Practices and to Restate its 2013 Financials ..........................................................................5

III.    Defendants Scramble to Find New Revenue Streams and Fix their Internal Controls, While Regulatory Scrutiny Continues to Increase ........................6

IV.     Defendants Falsely Assure Investors that Bridgepoint Had Fixed its Internal Controls.............................................................................................................8

V.      The Truth Emerges, Revealing the Material Falsity of the Company's Statements during the Class Period ...............................................................11

VI.     The Striking Similarities between the Reasons Underlying the 2013 and Class Period Restatements...................................................................................13

Argument.....................................................................................................................14

I.      Applicable Legal Standard and Governing Law ...........................................14

II.     The Complaint Adequately Pleads Falsity ....................................................15

III.    Defendants Made False and Misleading Statements with Scienter...............16

        A.      Legal Standard................................................................................16

        B.      The Complaint Adequately Pleads Scienter.....................................20

                1.      The Defendants Ignored Red Flags Raised by the 2013 Restatement.................................................................................20

                2.      Defendants Spoke at Length about the Company's Remediation Efforts........................................................................................22

                3.      Magnitude of the Restatement and Underlying Internal Control Weaknesses ...............................................................................23

                4.      Defendants Were Motivated to Ignore Internal Control Problems and Continue Improper Revenue Recognition .........24

        C.      The Complaint Adequately Pleads Scienter against the Company.....25

IV.     The Complaint Adequately Pleads Control Person Liability .......................25

Conclusion ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3226701 Can., Inc. v. Qualcomm, Inc.*,
No. 15cv2678-MMA (WVG), 2017 U.S. Dist. LEXIS 174367
(S.D. Cal. Oct. 20, 2017) ...................................................................................25

*Abdo v. Fitzsimmons*,
No. 17-cv-00851-EDL, 2017 WL 6994539 (N.D. Cal. Nov. 3,
2017) ....................................................................................................................17

*Alaska Elec. Pension Fund v. Adecco S.A.*,
371 F. Supp. 2d 1203 (S.D. Cal. 2005) ...............................................................5

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ..............................................................19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................18

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................14

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ..............................................................................18

*In re China Educ. All., Inc.*,
No. CV 10-9239 CAS, 2011 U.S. Dist. LEXIS 117416 (C.D. Cal.
Oct. 11, 2011) ....................................................................................................15

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) .............................................................................25

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................21

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001)..............................................................15

*Dobina v. Weatherford Int'l, Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ..................................................................22

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017) ................................................................22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)................................................................................................15

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) ..............................................................................17

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................................................17

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006) ............................................................15

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ..............................................................................17

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ..................................................................................22

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ..............................................................................16

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
No. 13 CV 214 (HB), 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ..................21

*M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
No. CV 17-1479 PA, 2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ...............17

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................14

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014)....................................................................9

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000)...............................................................18

*In re Medicis Pharm. Corp. Sec. Litig.*,
No. CV-08-1821-PHX-GMS, 2010 U.S. Dist. LEXIS 81410 (D.
Ariz. Aug. 9, 2010) ................................................................................................19

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................23

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008).................................................................................19

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ............................................................................17

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...............................................................................17

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ...............................................................................17

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) ...............................................................................25

*Parmelee v. Santander Consumer USA Holdings*,
No. 3:16-CV-783-K, 2018 U.S. Dist. LEXIS 1070 (N.D. Tex. Jan. 3, 2018) ...............................................................................................................23

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605 (9th Cir. 2017) ....................................................22

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..........................................................18, 21

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004).....................................................................23

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011) .............................................................................25

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006)............................................................18, 23

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ...................................................................20

*In re Sipex Corp. Sec. Litig.*,
No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854 (N.D. Cal. Nov. 17, 2005) .............................................................................................23

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ..................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................14, 16, 19

*In re Under Armour Sec. Litig.*,
342 F. Supp. 3d 658 (D. Md. 2018)........................................................22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009) ...............................................21, 22

*Wool v. Tandem Computs. Inc.*,
818 F.2d 1433 (9th Cir. 1987) ................................................................25

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215 (S.D.N.Y.
Feb. 18, 2005) .........................................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ............................................................18, 19

**Statutes**

15 U.S.C. § 78t(a) .........................................................................................25

Private Securities Litigation Reform Act of 1995 ........................................16

Securities Exchange Act of 1934 ...................................................1, 14, 25

**Rules and Regulations**

17 C.F.R. § 210.4-01(a)(1)...........................................................................13

17 C.F.R. § 240.10b-5(b) ..............................................................................15

Rule 10b-5 .................................................................................................1, 14

Rule 12(b)(6) ...........................................................................................14, 15

### Introduction

This is a federal securities class action against Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") and certain of its directors and executive officers on behalf of all persons who purchased or otherwise acquired the Company's securities between March 8, 2016 and March 12, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Bridgepoint is a for-profit higher education company. It was the fastest-growing private education company in the United States for many years, with enrollment peaking at 90,000 in 2012. But since 2012, the Company has faced a precipitous decline in student enrollment as well as tightening regulatory scrutiny, which have devastated Bridgepoint's revenue and operating income. The Company was also in danger of violating the "90-10" rule, which required that the Company could not earn more than 90% of its revenues from federal funds. If the Company ran afoul of this regulation it would lose access to Title IV funding, which was the lifeblood of the Company. Accordingly, it was critical for the Company to assure that at least 10% of its revenues were derived from private funds.

By March 2016 (the beginning of the Class Period), Defendants were increasingly resorting for drastic measures to reverse the decline in enrollment generally and to maintain compliance with the 90-10 rule. In particular, Defendants became increasingly reliant on what ultimately became known as Bridgepoint's Full Tuition Grant ("FTG") program. But instead of properly recognizing revenue from the FTG program, Defendants engaged in improper revenue recognition from the Program in order to prop up flagging revenues caused by declining student enrollments. Specifically, the Company failed to properly assess collectability of these revenues, in violation of GAAP. As a result, throughout the Class Period,

{00356768;36 }

1

Defendants reported artificially inflated revenue, net income, and accounts receivables figures while falsely assuring investors that the Company's internal controls over financial reporting were operating properly. Defendants made these errors during the Class Period even though just a few years earlier, in 2014, the SEC had found very similar problems with the Company's revenue recognition practices—which were serious enough that the SEC forced Bridgepoint to restate its financial statements for 2013.

On March 7, 2019, Bridgepoint announced that it had to restate its financial statements for the first three quarters of 2018 because its processes for recording revenue for the FTG program "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, accounts receivable, deferred revenue, and provision for bad debts. On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume.

On March 12, 2019, Bridgepoint detailed the necessary restatements in its annual report on Form 10-K for 2018 (the "2018 10-K") and its amended quarterly report for the third quarter of 2018 (the "2018 Q3 10-Q/A"). The Company's financials for the first three quarters of 2018 had to be restated as follows: net income decreased by $5.8 million ($23.8M to $18.05M, a decrease of 24%), revenue decreased $5 million ($353.7M to $348.7M, a decrease of 1.4%), accounts receivable decreased by $4.7 million ($33.57M to $28.9M, a decrease of 14%), and deferred revenue and student deposits (a liability account) increased by $4.5 million ($53.87M to $58.4M, an increase of 8.3%). The Company's 2016 and 2017 financials were restated in similar fashion. On this news, Bridgepoint's stock price fell again, from $7.00 on March 12, 2019 to $6.90 on March 13, 2019.

Defendants cannot seriously contest falsity and materiality; after all, Defendants' GAAP violations—which, among other things, resulted in an overstatement of net income of $5.8 million for the first three quarters of 2018—

{00356768;36 }

2

were serious enough to necessitate a restatement of the Company's financial statements. And as for scienter, the Complaint's allegations of Defendants' recklessness easily outweigh Defendants' competing theory of mere negligence. In 2014, the SEC had forced the Company to restate its 2013 financials and to change its revenue recognition practices going forward. For the next few years, Defendants repeatedly detailed the Company's remediation efforts towards correcting the internal control deficiencies, reassuring investors that they were focused on these issues and committed to resolving them. Meanwhile, as regulatory scrutiny continued to increase, the Company became increasingly reliant on its new Full Tuition Grant program as a source of revenues and as a way of remaining in compliance with regulations governing eligibility for federal student loans. Finally, in March 2017 Defendants told investors that those problems had in fact been fixed. Yet two years later, the Company was again forced to restate its financials, primarily with respect to the Full Tuition Grant program and for reasons very similar to those that had necessitated the earlier restatement. Accordingly, the Court should deny Defendants' Motion to Dismiss in its entirety.

<strong><u>Factual Statement</u></strong>

**I.      The Company's Enrollment and Regulatory Problems Worsen before the Class Period**

Bridgepoint is a for-profit post-secondary education company. In 2005, it acquired a small nearly-bankrupt college, renamed it Ashford University, and began operating and marketing it as a commercial venture. Online enrollment soon skyrocketed, and Bridgepoint enjoyed several years of extremely rapid growth. From 2007 to 2010, revenue grew from $85.7 million to $713.2 million, and profits grew from $4 million to $216 million. By 2008, it was the fastest growing for-profit education company in the United States. By 2012, Bridgepoint's student enrollment had reached 90,000—99% of whom were online. ¶¶ 77–86.

But after 2012, the Company's fortunes suddenly reversed. Student

{00356768;36 }

enrollment started falling rapidly and then continued to decline every year from 2012 until the end of the Class Period. Revenue declined just as quickly. By 2015, the Company had to absorb an operating loss of $42 million and could no longer afford to maintain Ashford University's physical campus. ¶¶ 84–86.

Meanwhile, Bridgepoint was facing constantly increasing scrutiny, not only among regulators but also among the general public. Bridgepoint's rapid growth had only been possible because of federal student aid programs, which provided more than 80% of its revenue. But even as Bridgepoint was enjoying record enrollment and revenue growth, its student withdrawal and loan default rates were getting worse and worse every year. In 2010, federal student aid programs paid $496.6 million to Bridgepoint (85% of its revenue that year), while Bridgepoint spent $211.6 million on advertising and recruiting and recorded $216.4 million in profit. Regulators (in particular, the Senate Health, Education, Labor and Pensions Committee) soon began raising serious questions as to whether Bridgepoint was achieving enrollment growth through aggressive advertising and recruiting without much regard for whether already-recruited students stayed enrolled or their likely ability to repay their student loans in the future. ¶ 83.

All of this also made it harder for Bridgepoint to remain in compliance with Title IV's 90/10 Rule. Under the 90/10 Rule, for-profit institutions participating in Title IV federal student aid programs had to derive at least 10% of their funding from sources other than Title IV in order to remain eligible for Title IV funds. By 2012, more than 85% of Bridgepoint's revenues came from Title IV funds—perilously close to the 90% cap. To avoid running into the 90% cap, Bridgepoint had to find new sources of revenue—at a time when its overall enrollment and revenue were quickly declining. ¶¶ 87–92.

Thus, declining enrollments exposed Bridgepoint to significant new regulatory risks and forced it to seek new revenue streams to reduce its reliance on federal student aid funds at a time of increasing regulatory scrutiny.

{00356768;36 }

4

**II.    The SEC Forces Bridgepoint to Change its Revenue Recognition Practices and to Restate its 2013 Financials**

Bridgepoint's strategy of chasing enrollment growth through aggressive advertising and recruiting, with little regard for the recruited students' likely ability to repay their student loans in the future, was even evident in the Company's revenue recognition practices.

Under GAAP, revenue cannot be properly recognized unless its collectability is reasonably assured. This means that properly accounting for revenue always requires *some* assessment of collectability.[1] And a reasonable credibility assessment must at the very least consider factors most obviously affecting collectability, such as who was ultimately responsible for the payment (e.g., an individual student as opposed to the federal government). *See, e.g., Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1213 (S.D. Cal. 2005) (companies must "make reasonable predictions about… collectability").

Instead, Bridgepoint simply treated all its revenues as fully collectable for 120 days (i.e., not just until the beginning of the next quarterly period), based on the assumption that everyone was waiting 120 days for financial aid payments to arrive (regardless of whether they were actually on financial aid) and that therefore collectability could be based on the federal government's creditworthiness. Then

---

[1] Under GAAP accrual accounting, revenue should generally be recognized at the time when the entity satisfies the relevant performance obligation. If payment is not received in the same time period, the revenue should be recognized as a *receivable* as soon as the entity satisfies the relevant performance obligation. The receivable should then remain on the entity's books and records until either (a) payment is received or (b) the amount is deemed to be uncollectable.

In addition, under ASC 310, at the beginning of every reporting period, an entity must assess the collectability of its receivables and then, if necessary, adjust their carrying value accordingly. The collectability assessment mandated under ASC 310 was applicable in 2013 and remains applicable today. Since 2018, ASC 606 has made clear that a collectability assessment is *also* necessary at the time revenue is recognized. But GAAP has always required a collectability assessment at each reporting period.

{00356768;36 }

after 120 days, Bridgepoint just wrote off set percentages of the uncollected amounts as "bad debts." Most problematically, Bridgepoint had been recognizing revenues for students that subsequently lost financial aid eligibility, and when that revenue was not collected—as was to be expected—it was later written off as a bad debt expense. *See* ¶¶ 106–15.

The Company did not begin to remedy this until 2014, when the SEC caught onto Bridgepoint's accounting gimmickry, forcing Bridgepoint to restate its 2013 financial statements and to change its revenue recognition practices going forward. As Bridgepoint admitted in the 2013 10-K/A, it had failed to "maintain effective internal controls over the accounting for revenue recognition" in that "the process for analyzing the collectability criterion for revenue recognition was not designed to reassess collectability, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions," which "resulted in the misstatement of our revenue, bad debt expense, and accounts receivables." ¶ 114. In particular, "revenues recognized subsequent to a student losing financial aid eligibility and ultimately not collected were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters." ¶ 110.

## III.    Defendants Scramble to Find New Revenue Streams and Fix their Internal Controls, While Regulatory Scrutiny Continues to Increase

Following the sudden reversal in the Company's business prospects, Defendants began taking drastic measures to reverse the decline, remain in compliance with the 90/10 Rule (as necessary to remain eligible for student aid funds), and convince investors not to abandon the Company.

Part of this required fixing the internal control problems that had necessitated the restatement of the Company's 2013 financials. In August 2014, Defendants told investors in the 2013 10-K/A that the Company would take

{00356768;36 }

"additional measures to remediate the underlying causes of the material weaknesses," "primarily through additional training efforts regarding reassessing the collectability of funds owed by students during the period of revenue recognition and the definition of restricted cash by the members of management with the requisite level of knowledge, experience and training to appropriately apply GAAP." ¶ 115. But as *late as March 2, 2016*—when it filed its 2015 10-K—the Company still had not fixed its internal control problems and had even discovered a new material weakness: that the Company "also did not maintain effective controls to assess the reliability of system generated data used in the operation of certain revenue recognition controls." To address this, the 2015 10-K told investors that the Company's plan to remediate these control deficiencies included "the hiring of new accounting personnel," "providing additional training for existing personnel," and "the implementation of financial reporting risk assessments and review processes to ensure the related significant accounting policies are implemented and applied properly under GAAP on a consistent basis through the Company." ¶¶ 120–22.

Meanwhile, regulatory pressure only continued to increase. By March 2016, the Consumer Financial Protection Bureau, the Department of Education Office of Federal Student Aid, and the California Attorney General had begun investigations into the Company, concerning matters such as "whether for-profit post-secondary education companies or other unnamed persons have engaged in or are engaging in unlawful acts or practices related to the advertising, marketing or origination of private student loans." ¶ 119. On May 18, 2016—only weeks after filing its 2015 10-K—the SEC expanded its investigation to include Bridgepoint's "scholarship and institutional loan programs and any other extensions of credit made by the Company to students" since 2011 as well as "student enrollment and retention at the Company's academic institutions" since 2014. ¶ 125. And on July 12, 2016, Bridgepoint announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have

{00356768;36 }

misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act." ¶ 126.

Moreover, it had become clear that Bridgepoint could not rely too heavily on GI Bill funds as a potential source of non-Title IV revenue in order to maintain compliance with the 90/10 rule, or as a way to increase enrollment. ¶¶ 93–96. As it became less and less able to rely on government tuition assistance for military personnel, and as its loan programs came under more and more regulatory scrutiny, Bridgepoint had to find other ways to increase enrollment and revenues from non-Title-IV sources (in order to remain in compliance with the 90/10 Rule). Thus, Bridgepoint became increasingly reliant on its Full Tuition Grant ("FTG") Program, which included various corporate partnerships with employers to offer their employees a way to pursue and complete a college degree purportedly without incurring any student debt. ¶¶ 97–103.

**IV.   Defendants Falsely Assure Investors that Bridgepoint Had Fixed its Internal Controls**

Due to these problems, by late 2015, the Company was under considerable pressure to assure investors and regulators that it was addressing these internal control problems. In October 2015, the Company appointed Defendant Kevin Royal as the Company's new Chief Financial Officer. From April 2009 until May 2015, Defendant Royal had been CFO and Treasurer of Maxwell Technologies, Inc., which had been forced to restate its financial statements for 2011 and the first three quarters of 2012 for reasons relating directly to recognizing revenue without conducting the collectability assessment required under GAAP.

> Maxwell's sales organization made secret arrangements with certain
> distributors for special payment terms. The distributors would not
> have to pay Maxwell until the distributor was paid by the customers.
> Under Maxwell's revenue recognition policy, revenue is only to be
> recognized where certain conditions are met, including that the
> collectability of the revenue is "reasonably assured." (Compl. ¶¶ 29,

{00356768;36 }

134-35). However, Maxwell recognized the revenue from these sales too early, causing the financial statements to overstate revenue.

*In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1028 (S.D. Cal. 2014). Defendant Royal thus had particular experience with improper revenue recognition issues arising out of a failure to conduct collectability assessments.

On March 24, 2016—only weeks after the Company had had to admit to investors in the 2015 10-K that it had not fixed its internal control problems and had even discovered a new material weakness—Bridgepoint announced that it had dismissed PricewaterhouseCoopers, LLP ("PwC") as its auditor and had hired Deloitte & Touche LLP ("Deloitte") in its place. ¶¶ 120–24. Finally, on March 7, 2017, the Company told investors in its 2016 10-K that it had fixed its material weaknesses:

> ***We have implemented measures to remediate the control deficiencies that gave rise to the material weaknesses***. These measures include the hiring of new accounting personnel, provision of additional training to new and existing personnel, and implementation of financial reporting risk assessments and review processes to ensure significant accounting policies are implemented and applied properly under GAAP on a consistent basis throughout the Company. We performed a review of all key reports utilized in the revenue and receivable cycle to ensure appropriate controls are in place over the completeness and accuracy of the underlying data used in these key reports. We have also established enhanced procedures to ensure appropriate review of accounting policies by the members of our management team with the requisite level of accounting knowledge, experience and training.
>
> ***We believe the above measures have enabled us to remediate the control deficiencies that gave rise to the material weaknesses.*** We will continue to maintain appropriate focus on this critical accounting area going forward. We ***believe these measures have remediated the identified control deficiencies and strengthen internal control over financial reporting***.

¶ 127 (emphasis added). This was false and misleading because the Company had

not in fact remediated its control deficiencies or material weaknesses. According to Former Employee 1 ("FE1")—who worked at PwC from 2010 to 2013 as part of a team charged with auditing Bridgepoint's financial statements, and later worked at Bridgepoint from 2016 to 2017, focusing specifically on revenue recognition issues—the internal control problems that necessitated the 2019 restatement and had existed as far back as 2013. Specifically, the Company still routinely recognized revenues without conducting collectability assessments on a student-by-student basis as required under GAAP. ¶¶ 128–35.

This caused particularly significant errors with respect to recognizing revenues from the FTG program. According to FE1, even though the FTG program was structured differently from the Company's usual course offerings, Bridgepoint kept using its old accounting software, which was not configured adequately for revenue that was customized, and refused to upgrade or configure it so that it could properly track revenues from the FTG program. According to FE1, Bridgepoint typically charged $1,400 per class. But in order to convince corporations to sign up for the FTG program, Bridgepoint had to offer concessions and discounts, which varied heavily from one company to the next. As a result, Bridgepoint ultimately reached different deals with hundreds of companies, and their contracts were all very customized. But when recognizing revenue for the FTG program, Bridgepoint ignored the contracted price, recorded a fixed $1,400 in deferred revenue, and then did a "patchwork fix" by booking "some kind of scholarship that would net against the revenue." ¶¶ 128–35.

Moreover, according to FE1, Defendants knew about the control problem because PwC discovered the problem and informed the Company, after which the Company fired PwC on March 24, 2016 and hired Deloitte instead as its auditor. In addition, according to FE1, Defendant Royal pressured FE1 and others to sign off on calculations they lacked the knowledge to approve. FE1 warned Associate Vice President of Accounting Jose Alberto Mendoza, as well as Chief Accounting Officer and Corporate Controller Steve Burkholder, about FE1's concerns with the

{00356768;36 }

accounting process for the FTG program, and refused to sign off on some internal controls related to it. ¶¶ 128–35.

## V.   The Truth Emerges, Revealing the Material Falsity of the Company's Statements during the Class Period

On March 7, 2019, Bridgepoint announced that it had to restate its financial statements for the first three quarters of 2018 because its processes for recording revenue for the FTG program "were not designed with sufficient precision," leading to "material" accounting errors related to revenue, accounts receivable, deferred revenue, and its provision for bad debts, which resulted in the overstatement of revenue and accounts receivable. On this news, Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume. ¶¶ 155–58.

On March 12, 2019, Bridgepoint detailed the necessary restatements in its annual report on Form 10-K for 2018 (the "2018 10-K") and its amended quarterly report for the third quarter of 2018 (the "2018 Q3 10-Q/A"). In particular, the Company's financials for the first three quarters of 2018 had to be restated as follows: net income decreased by $5.8 million ($23.8M to $18.05M, a decrease of 24%), revenue decreased $5 million ($353.7M to $348.7M, a decrease of 1.4%), accounts receivable decreased by $4.7 million ($33.57M to $28.9M, a decrease of 14%), and deferred revenue and student deposits increased by $4.5 million ($53.87M to $58.4M, an increase of 8.3%). ¶¶ 159–172. Nor were the errors limited to 2018, as the 2018 10-K made clear that Bridgepoint had been improperly accounting for its FTG program as far back as 2015, necessitating restatements of the Company's financial statements for 2016 and 2017 as well as a cumulative adjustment to retained earnings as of January 1, 2016 for what Defendants called "immaterial adjustments impacting 2015 and prior." As a result of the restatement, the Company's 2017 financials were impacted as follows: net income decreased by $1.4 million ($10.5M to $$9.1M), revenue decreased by $3.4 million ($478.4M to

$475M), accounts receivable decreased by $2.8 million ($27M to $24.2M), and deferred revenue and student deposits increased by $2.8 million ($68M to $70.8M). For 2016, net loss increased by $3 million ($30M to $33M), revenue decreased by $3.5 million ($527M to $523.5M), and accounts receivable decreased by $3 million ($34.7M to $31.7M). ¶¶ 173–78. Following this news, Bridgepoint's stock price fell once again, declining from $7.00 on March 12, 2019 at close to $6.90 at close on March 13, 2019. ¶ 163.

These restatements made clear that the Company's financial statements during the Class Period were false and misleading due to the GAAP violations detailed herein. Moreover, the 2015 10-K, 2016 10-K, and 2017 10-K contained signed SOX certifications stating that they "fairly present in all material respects the financial condition, results of operations and cash flows" of the Company, which were false and misleading because the Company in fact did have significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, and the corresponding financial statements did not, in fact, comply with GAAP. ¶¶ 136–54. Accordingly, all of the statements referenced above were materially false and misleading because (i) Defendants were reckless in designing and/or employing the Company's processes for recording revenue, deferred revenue, accounts receivable, and bad debt expense for its FTG program in a manner that violated GAAP, SEC regulations, and its own stated revenue recognition policy; (ii) Bridgepoint failed to maintain effective internal controls over financial reporting; and (iii) due to the foregoing deficiencies, Bridgepoint made material accounting errors related to deferred revenue, accounts receivable, and its provision for bad debts in its financial statements during the Class Period— most significantly, Bridgepoint's financial statements for the first three quarters of 2018 overstated revenue by $5.06 million and overstated net income by $5.78 million—which violated GAAP, SEC regulations, and its own stated revenue recognition policy and thus rendered Bridgepoint's financial statements for the

{00356768;36 }

Class Period "misleading or inaccurate" under 17 C.F.R. § 210.4-01(a)(1). *See* ¶¶ 157–78.

## VI. The Striking Similarities between the Reasons Underlying the 2013 and Class Period Restatements

The Company's stated reasons for restating its financial statements for 2013 were strikingly similar to its stated reasons for restating its financial statements issued during the Class Period. They had similar impacts on revenue, accounts receivable, and net income, as shown in the table below:

|  | Restatement of 2013 Financials | Restatement of 2018 Financials |
| --- | --- | --- |
| **Net Income decrease** | $4.9M ($45.9M to $41.0M) | $5.8M ($23.8M to $18.05M) |
| **Revenue decrease** | $17.2M ($768.6M to $751.4M) | $5M ($353.7M to $348.7M) |
| **Accounts receivable decrease** | $5.6M ($41.4M to $35.8M) | $4.7M ($33.57M to $28.9M) |

The underlying GAAP violations preceding these restatements were also highly similar. Both resulted from a failure to maintain effective internal controls over the accounting for revenue recognition. In the 2013 Restatement, the control deficiency was that "the process for analyzing the collectability criterion for revenue recognition was not designed to reassess collectability, on a student-by-student basis, throughout the period revenue was recognized"—which was particularly problematic "in circumstances such as when a student loses financial aid eligibility." ¶ 110. In the Class Period Restatement, the control deficiency was that "the process used for recording the revenue for the Full Tuition Grant program… and the related judgments and estimates were not designed with sufficient precision," in large part "due to allowances that had not been properly determined" as well as errors in applying ASC 606 "as it relates to the Full Tuition

Grant Program, specifically the time period for which to recognize revenue in 2018 related to Full Tuition Grant students that became inactive." ¶¶ 157–59, 167.[2] Therefore, in both cases, the revenue recognition problems were particularly severe with respect to students who had previously been eligible for external funding (either from federal student loans or through the FTG program) but had become ineligible—at which point the students themselves became responsible for any remaining tuition, giving rise to collectability concerns that the Company failed to properly account for. ¶¶ 169–72. Just as the 2013 Restatement resulted in part from the Company's reckless failure to track which students were receiving financial aid (rendering it incapable of assessing collectability with respect to students who had become ineligible), the Class Period Restatement resulted in part from the Company's reckless failure to sufficiently track which students in the FTG program were active (rendering it incapable of precisely calculating allowances with respect to students who had become inactive).

## Argument

**I.     Applicable Legal Standard and Governing Law**

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007).

---

[2] In the context of the FTG program, "allowance" referred to any course that was not eligible for reimbursement because the student's grades were unsatisfactory. A student with more than two allowances would become ineligible for the FTG program and therefore have to pay any remaining tuition in cash. ¶¶ 61–63.

{00356768;36 }

Under Section 10(b) of the Exchange Act and SEC Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a 10(b) claim, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (citation omitted). While Exchange Act claims are subject to a heightened pleading standard under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)." *In re China Educ. All., Inc.*, No. CV 10-9239 CAS (JCx), 2011 U.S. Dist. LEXIS 117416, at *8 (C.D. Cal. Oct. 11, 2011).

## II.     The Complaint Adequately Pleads Falsity

Defendants cannot reasonably dispute the sufficiency of Plaintiff's allegations that their financial statements were materially false when made. As detailed above, Bridgepoint was forced to restate its financial statements for the first three quarters of 2018 due to "material" accounting errors related to revenue, accounts receivable, deferred revenue, and provision for bad debts, resulting in the overstatement of revenue, income, and accounts receivable. A restatement is an admission that the Company's earlier financial statements were materially false at the time they were made. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006) ("By definition ... a restatement says that the prior financial statement was false.") (internal quotations and citations omitted); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2215, at *23 (S.D.N.Y. Feb. 18, 2005) (company's "admission of what its financial statements should have been in prior years is highly probative of whether the

{00356768;36 }

previously filed documents were false," while the "magnitude of the corrections speak directly to the issue of materiality"); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001).

The Complaint also sufficiently alleges the falsity of Defendants' statements regarding internal controls. Effective internal controls are crucial for investors who, absent effective controls, cannot fairly rely on the company's financial reporting. *See, e.g., In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 470-71, 507-08 (S.D.N.Y. 2011) (the "lack of effective internal controls at Bear Stearns facilitated its efforts to mislead investors because without those controls it was able to represent that: it was exposed to significantly less risk than was truly inherent in the assets it possessed" and that "its risk management personnel and procedures were effective and reliable" and ultimately "triggered foreseeable and grave consequences" including "stock price drops [that] were foreseeable consequences of the disclosure of [the company's] liquidity crisis" and "risk management practices").

## III.   Defendants Made False and Misleading Statements with Scienter

### A.   Legal Standard

"To plead scienter adequately, the complaint must state with particularity facts giving rise to a strong inference that defendants engaged in knowing or intentional conduct, which includes deliberate recklessness." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (internal quotations and citations omitted). An inference of scienter is "strong" if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324. Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original); *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* permits a

{00356768;36 }

16

series of less precise allegations to be read together to meet the PSLRA requirement . . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."). The Ninth Circuit has emphasized that "dishonest insiders may be able to cover their tracks fairly well . . . [u]nless reasonable inferences from circumstances suffice to get a case to a jury." *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

"Scienter can be established by direct or circumstantial evidence." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). Accordingly, a plaintiff can establish scienter "by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Id*. A defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (internal quotations and citation omitted).

"[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *N.M. State Inv. Council v. Ernst & Young LLP,* 641 F.3d 1089, 1098 (9th Cir. 2011) (internal quotations and citation omitted).[3] Accordingly, a

---

[3] The Ninth Circuit has declined to rule on whether it is "possible to plead scienter under a collective theory." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). "The Ninth Circuit has not addressed the issue, and district courts within the Ninth Circuit have come out on both sides." *Abdo v. Fitzsimmons*, No. 17-cv-00851-EDL, 2017 WL 6994539, at *8 (N.D. Cal. Nov. 3, 2017)) (citations omitted); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014) (courts may "impute scienter to individual defendants in some situations, for example, where . . . a company's public statements [are] … so dramatically false that they would create a strong inference

{00356768;36 }

17

complaint may plead scienter via "specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotations and citation omitted); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (an "egregious refusal to see the obvious, or to investigate the doubtful" may constitute recklessness); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004) (a strong inference of scienter may arise where a complaint alleges specific facts that "demonstrate high-level officials within the company ignored red flags that should have alerted them to the fact that" the company's public statements were false).

Importantly, "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Air*, 324 F. Supp. 2d at 486. "While a financial restatement by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, *significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter*." *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) (internal quotations and citations omitted) (emphasis added).

And "significant GAAP violations … described with particularity … may provide powerful indirect evidence of scienter" because, "[a]fter all, books do not cook themselves." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). In particular, a restatement due to accounting violations, without more, "may itself be indicative of scienter where it is combined with allegations regarding [] management's role in the company that are particular and

that at least some corporate officials knew of the falsity upon publication") (internal quotations and citation omitted); *M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWx), 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017).

{00356768;36 }

suggest" that the defendant must have known its accounting methodology was wrong, or where "the nature of the relevant [violation] is of such prominence or obviousness that it would be absurd to suggest that management was without knowledge" of the violation. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) (internal quotations and citation omitted). In addition, false Sarbanes-Oxley certifications can support an inference of scienter. *Id*. at 1004; *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 702, 724 (W.D. Tex. 2010) (SOX certifications may "contribute significantly" to strong inference of scienter if defendants had "reason to know or suspect the financial statements they were then signing contained material misrepresentations or omissions").

To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. *See id.*at 721 (when the "number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter") (citation omitted); *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 U.S. Dist. LEXIS 81410, at *13 (D. Ariz. Aug. 9, 2010) (allegations that support scienter include: "(1) the magnitude, obviousness, and reasonableness of the violation; (2) the omission in public statements of material facts related to the GAAP violation; (3) the defendant's potential motive or reason for using the accounting methods it did; and (4) other statements or conduct indicating that the defendant intentionally or recklessly misapplied GAAP.") (citing cases).

Importantly, while the "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," the inferences supporting liability need only be as strong. *Tellabs,* 551 U.S. at 310. In other words, where there are equally strong inferences for and

{00356768;36 }

against scienter, the tie goes to the plaintiff. *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008).

**B.      The Complaint Adequately Pleads Scienter**

The Complaint "contains extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014). Indeed, these allegations easily outweigh Defendants' competing theory of mere negligence.

**1.      The Defendants Ignored Red Flags Raised by the 2013 Restatement**

The Class Period Restatement was prompted by the Company's practice of recognizing revenue for its FTG Program without properly assessing whether collectability was reasonably assured, as required under GAAP. The reasons behind the Class Period Restatement are eerily reminiscent of the 2013 Restatement, which arose out of the Company's improper practice of recognizing revenue without assessing collectability, as required under GAAP. *See supra* at 11–12 (noting that the Company's "process for analyzing the collectability criterion for revenue recognition was not designed to reassess collectability, on a student-by-student basis, throughout the period revenue was recognized"). Following the earlier restatement, the SEC forced the Company to change its revenue recognition practices going forward, and the Company pledged to correct the underlying control problems that had caused the collectability errors. For years thereafter, Defendants repeatedly spoke at length and in detail regarding the Company's remediation efforts towards correcting the internal control deficiencies, reassuring investors that they were focused on these issues and committed to resolving them. Finally, in March 2017 Defendants told investors that those problems had in fact been fixed. Yet two years later, the Company was again forced to restate, citing failure to assess collectability yet again as the culprit.

{00356768;36 }

The 2013 Restatement and acknowledged internal control problems were glaring red flags that put the Defendants on notice that the Company had significant problems with respect to its practices of revenue recognition. Defendants "were in a position to recognize the significance of these red flags, and, accordingly, investigate." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1062 (C.D. Cal. 2008) ("It is irrelevant that the data underlying these 'red flag' trends were fully disclosed to investors" because defendants, "unlike the investing public, were members of Board Committees charged with oversight" of the company's risk exposure); *see also In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 (HB), 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014) ("The alleged failure to take any action in response to acknowledged reporting failures supports a finding of scienter."); *Refco*, 503 F. Supp. 2d at 653 (holding that, while "[m]ere membership in a committee with oversight responsibilities" is not enough to establish scienter, "[a]llegations that an audit committee failed to take steps to prevent fraud may suffice"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (finding that knowledge of "weak internal controls" supports a finding of scienter).

Here, the fact that the same revenue recognition issues of collectability underlying the 2013 Restatement resurfaced in the Class Period Restatement strongly supports an inference that Defendants were aware of, but deliberately disregarded, the appropriate GAAP requirements for revenue recognition concerning the FTG Program. Thus, under these circumstances, Defendants' competing theory of innocent "negligence" rings hollow. It is at least equally likely that, instead of fixing the problems identified in the 2013 Restatement, Defendants ignored these red flags and simply continued business as usual, ignoring collectability concerns in their pursuit of maintaining high revenues. In fact, FE1 confirmed that Defendants continued the same practices from 2013 and continued to recognize revenues that they knew, or recklessly disregarded, were unlikely to

{00356768;36 }

21

materialize. Defendants' brief barely acknowledges the similarities between the two restatements.

### 2. Defendants Spoke at Length about the Company's Remediation Efforts

As noted above, for years after the 2013 Restatement, Defendants repeatedly spoke at length and in detail regarding the Company's remediation efforts towards correcting the internal control deficiencies, reassuring investors that they were focused on these issues and committed to resolving them. Finally, in March 2017, Defendants told investors that those problems had in fact been fixed. The fact that Defendants spoke repeatedly and in detail about the Company's deficient internal controls and related remediation efforts supports an inference that they acted with scienter. *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("[T]he inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement."), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605 (9th Cir. 2017); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("focused questions" and continued concealing of truth support a strong inference of scienter); *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 692 (D. Md. 2018) (scienter inference supported by allegations that defendants were senior executives who repeatedly spoke about core operations at conferences and in analyst calls where they answered detailed questions); *Varghese,* 672 F. Supp. 2d at 608 ("repeated disclosures of CSP's weak internal controls" constituted "evidence that the CSP Defendants were aware of the deficient controls, and that these flaws were likely influencing financial results" sufficient to "support a strong inference of scienter"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468-69 (S.D.N.Y. 2017) (defendants' signing of SOX certifications while aware of "red flags" that "highlighted significant problems with Eletrobras's internal controls" supported a "strong inference that [they] acted

{00356768;36 }

22

with scienter”); *Dobina v. Weatherford Int'l, Ltd.*, 909 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2012) (finding scienter as to repeated false SOX certifications based on defendant's "personal involvement … in designing and evaluating Weatherford's internal controls, the stark realities about the inadequacies of the internal controls that were revealed in the March 2011 restatement, [and] the audit delays and control deficiencies expressly raised to him during the class period").

### 3. Magnitude of the Restatement and Underlying Internal Control Weaknesses

Defendants restated 2018 net income downward by 24%, a significant amount, and had to undertake yet another an extensive remediation plan to fix internal control deficiencies that it had previously said had been resolved. The magnitude of the restatement, as well as the remediation plan ultimately necessary to correct the underlying internal control problems, further supports an inference of scienter. *See In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *3 (N.D. Cal. Nov. 17, 2005) (extensive remediation plan supported scienter because "[s]uch house-cleaning and reforms do not follow innocent mistakes" and "customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls"); *see also In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d at 705-09 (restatement that reduced revenue by 15% in 2000 and 30% in the first nine months of 2001 "significantly contribute[d] to a finding of scienter"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) ("the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 376 (D. Md. 2004) (collecting cases); *Parmelee v. Santander Consumer USA Holdings*, No. 3:16-CV-783-K, 2018 U.S. Dist. LEXIS 1070, at *11-13 (N.D. Tex. Jan. 3, 2018) ("repeated restatements and the significant overstatement in net income during the Class Period"—specifically that "Santander

{00356768;36 }

23

overstated its net income by 61.8% in the fourth quarter of 2014 and by 19.3% in the first quarter of 2015"— "contribute to a strong inference of scienter").

Moreover, the Company dismissed its auditor in March 2016, even as it was under investigation by several regulators. And according to FE1, Defendants did this because PwC had discovered the Company's improper revenue recognition practices for its FTG Program. This suspicious timing also supports scienter.

### 4. Defendants Were Motivated to Ignore Internal Control Problems and Continue Improper Revenue Recognition

Motive, although not required, can support a strong inference of scienter. Here, Defendants had a strong, unique motive to engage in the improper accounting. As noted earlier, Bridgepoint was subject to extensive federal regulations governing its eligibility to participate in federal student aid programs. In particular, the 90-10 Rule specified that Bridgepoint could not generate more than 90% of its revenues from Title IV funding. And during the Class Period, Defendants were dangerously close to exceeding the 90% limitation.

For similar reasons, the various governmental investigations into the Company's practices are further probative of scienter. By 2016, the CFPB and Department of Education were investigating the Company's marketing and enrollment practices, and the SEC had subpoenaed the Company for documents regarding the Company's "scholarship and institutional loan programs and any other extensions of credit made by the Company to students, and student enrollment and retention at the Company's academic institutions." ¶ 125. As it became less and less able to rely on government tuition assistance for military personnel, and as its loan programs came under more and more regulatory scrutiny, Bridgepoint had to find other ways to increase enrollment and revenues from non-Title-IV sources (in order to remain in compliance with the 90/10 Rule). Thus, Defendants were motivated to collect as much revenue as they could from non-Title IV sources (like the FTG program) and to ignore collectability concerns in the

{00356768;36 }

interest of meeting the numbers they needed to maintain 90-10 compliance.

**C.      The Complaint Adequately Pleads Scienter against the Company**

The Court should impute scienter to the Company due to the strong inference of scienter against the Individual Defendants. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 479 (9th Cir. 2015) (imputing the scienter of the company's "founder and CEO, the one person on whom the board undoubtedly should have kept close tabs," to the company and noting that "[p]ermitting imputation under these circumstances encourages appropriate corporate oversight"); *3226701 Can., Inc. v. Qualcomm, Inc.*, No. 15cv2678-MMA (WVG), 2017 U.S. Dist. LEXIS 174367, at *75 (S.D. Cal. Oct. 20, 2017).

**IV.     The Complaint Adequately Pleads Control Person Liability**

A Section 20 claim requires an underlying section 10(b) claim and an allegation that the defendant controlled the 10(b) violator. 15 U.S.C. § 78t(a). The "determination of who is a controlling person… is an intensely factual question" and that a "plaintiff need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (citations omitted). "[I]ndicia of 'control' include whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements." *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citations omitted). Here, the Complaint sufficiently alleges Defendants' ability to control the Company through their involvement in day-to-day affairs. *See Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987).

<u>**Conclusion**</u>

For these reasons, Defendants' motion to dismiss should be denied.

Dated: January 13, 2020                    Respectfully submitted,

*/s/ Murielle J. Steven Walsh*

{00356768;36 }

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:   (212) 661-1100
Email: jalieberman@pomlaw.com
        mjsteven@pomlaw.com
        aiqbal@pomlaw.com

*Attorneys for Lead Plaintiff Shiva Stein*

{00356768;36 }

26