1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHIVA STEIN, Individually and
on Behalf of All Others Similarly
Situated,

                        Plaintiff,

v.

BRIDGEPOINT EDUCATION,
INC.; ANDREW S. CLARK;
KEVIN ROYAL; AND JOSEPH
L. D'AMICO,

                        Defendants.

Case No.:  3:19-cv-00460-WQH-AHG

**ORDER**

HAYES, Judge:

   The matter pending before the Court is the Motion to Dismiss filed by Defendants Bridgepoint Education, Inc.; Andrew S. Clark; Kevin Royal; and Joseph L. D'Amico.  (ECF No. 22).

## PROCEDURAL BACKGROUND

   On March 8, 2019, Plaintiff Shiva Stein initiated this action by filing a class action Complaint against Defendants Bridgepoint Education, Inc. ("Bridgepoint"); Andrew S. Clark; Kevin Royal; and Joseph L. D'Amico for claims pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934.  (ECF No. 1).

On June 18, 2019, Plaintiff filed a Motion for Appointment as Lead Plaintiff and Approval of Counsel.  (ECF No. 8).  On July 12, 2019, Plaintiff filed a Notice of Non-Opposition.  (ECF No. 12).  On August 2, 2019, the Court issued an Order stating:

> IT IS HEREBY ORDERED that the Motion for Appointment as Lead Plaintiff and Approval of Counsel filed by Plaintiff Shiva Stein (ECF No. 8) is GRANTED.  The Court appoints Plaintiff Shiva Stein to serve as lead plaintiff in this action.  The Court approves Plaintiff's choice of counsel and appoints Pomerantz as lead counsel in this action.

(ECF No. 13 at 7).

On October 1, 2019, Plaintiff filed an Amended Complaint.  (ECF No. 19).  Plaintiff brings the following causes of action: (1) violations of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5 against all Defendants, and (2) violation of § 20(a) of the Securities Exchange Act of 1934 against Defendants Andrew S. Clark, Kevin Royal, and Joseph L. D'Amico.  *See id*. at 67-70.  Plaintiff seeks a determination "that the instant action may be maintained as a class action," certification of "Lead Plaintiffs as Class representatives," damages, pre-judgement and post-judgment interest, attorneys' fees, expert fees, other costs, and "other and further relief as this Court deems just and proper."  *Id*. at 71.

On November 27, 2019, Defendants filed a Motion to Dismiss[1].  (ECF No. 22).  On January 13, 2020, Plaintiff filed a Response in opposition.  (ECF No. 23).  On February 11, 2020, Defendants filed a Reply.  (ECF No. 24).

## ALLEGATIONS OF THE AMENDED COMPLAINT

Plaintiff acquired Defendant Bridgepoint's securities "at artificially inflated prices" "between March 8, 2016 and March 12, 2019, both dates inclusive," (the "Class Period") "and was damaged upon the revelation of the alleged corrective disclosures."  (ECF No.

---

[1] Defendants request the Court to take judicial notice of the following two documents: (1) the SEC's October 24, 2019 No-Action Letter regarding In the Matter of Bridgepoint Education, Inc. (FW-3886) and (2) the March 26, 2016 Form 8-K filed by Defendant Bridgepoint in connection with its dismissal of PwC.  *See* ECF No. 22-2 at 2-4.  The Court has not considered these documents in resolving this Order.

19 at 4, 6). Plaintiff brings this action "on behalf of all persons who purchased or otherwise acquired" Defendant Bridgepoint's securities during the Class Period. *Id.* at 4. Defendant Bridgepoint was a Delaware corporation with its principal executive offices in San Diego, California. *See id.* at 6-7. On April 2, 2019, Defendant Bridgepoint "changed its name to Zovio Inc. and moved its headquarters" to Chandler, Arizona. *Id.* at 7. Defendant Andrew S. Clark "co-founded [Defendant] Bridgepoint in November 2003 and has served [ ] [sic] at all relevant times as [Chief Executive Officer ("CEO")], President, and a director of [Defendant] Bridgepoint." *Id.* Defendant Kevin Royal "served as [Defendant] Bridgepoint's Chief Financial Officer ('CFO') from October 1, 2015 until October 13, 2017 and then since April 16, 2018." *Id.* at 8. Defendant Joseph L. D'Amico "served as [Defendant] Bridgepoint's Interim CFO from October 16, 2017 until April 16, 2018." *Id.* at 7.

Defendant "Bridgepoint is a provider of post-secondary education services." *Id.* at 28. "Originally, [Defendant] Bridgepoint was a provider of 'affordable, accelerated work-place related courses for adult students seeking a bachelor's degree' backed by the global private equity firm Warburg Pincus." *Id.* "But its business model changed dramatically in March 2005, when it acquired what became Ashford University." *Id.* "Before the acquisition, Ashford University was a small regionally accredited non-profit religious college in Iowa …." *Id.* "After the acquisition, [Defendant] Bridgepoint renamed it to 'Ashford University' and began operating it as a for-profit commercial venture." *Id.* at 29. "In September 2007, [Defendant] Bridgepoint bought the Colorado School of Professional Psychology in Colorado Springs and renamed it University of the Rockies." *Id.* "Over the next decade, Ashford grew rapidly, eventually peaking at more than 90,000 students." *Id.* "However, virtually all of [Defendant] Bridgepoint's enrollment growth was online." *Id.*

"Around 2012, after years of rapid growth, [Defendant] Bridgepoint's business prospects started declining rapidly." *Id.* at 30. "Enrollment started declining quickly every year, which devastated [Defendant] Bridgepoint's revenue and operating income …." *Id.* "By 2015, [Defendant] Bridgepoint could no longer afford to maintain Ashford

University's physical campus, and was forced to shut down the physical campus." *Id*. at 30-31. "Following this sudden reversal in [Defendant Bridgepoint]'s business prospects, Defendants began taking drastic measures to reverse the decline as well as to convince investors not to abandon [Defendant Bridgepoint]." *Id*. at 31. "Declining enrollments also exposed [Defendant] Bridgepoint to significant new regulatory risks and forced it to seek new revenue streams to reduce their reliance on federal student aid funds at a time of increasing regulatory scrutiny." *Id*.

"By 2012, more than 85% of [Defendant] Bridgepoint's revenues came from federal student aid funds under Title IV of the Higher Education Act …." *Id*. "[U]nder Title IV's '90/10' Rule, in order to maintain access to federal student aid funds, Ashford University and University of the Rockies had to generate at least 10% of their revenues from sources other than federal student aid under Title IV." *Id*. "To avoid running into the 90% cap, [Defendant] Bridgepoint had to find new sources of revenue—at a time when its overall enrollment and revenue were quickly declining." *Id*. at 32.

Defendant Bridgepoint "formed various corporate partnerships with employers to offer their employees a way to pursue and complete a college degree purportedly without incurring any student debt." *Id*. at 33. Over time, Defendant "Bridgepoint became increasingly reliant on one such program—what it now calls its Full Tuition Grant ('FTG') Program." *Id*. "The FTG [P]rogram … differed from [Defendant Bridgepoint]'s typical scholarships." *Id*. at 36. "Typically, scholarships would be tied to a 'specific course, term or payment period.'" *Id*. "In contrast, the FTG [P]rogram was a 12-month grant under which students were 'eligible to take up to ten undergraduate or eight graduate courses per 12-month grant period.'" *Id*. (emphasis omitted).

"In 2014, the SEC heightened its scrutiny regarding [Defendant] Bridgepoint's accounting practices, especially with respect to revenue recognition and receivables." *Id*. at 37. Pursuant to Generally Accepted Accounting Principles ("GAAP"), "revenue cannot be properly recognized if its collectibility is not reasonably assured." *Id*. at 38. "But [Defendant] Bridgepoint had been blindly basing this determination of collectibility for

many of its students based on the government's ability to pay, reasoning that [Defendant] Bridgepoint students will most likely be eligible for federal student loans—even though [Defendant Bridgepoint] knew, and admitted, that not every student was receiving financial aid, and not all of [Defendant] Bridgepoint's revenue was actually collected from the government." *Id.* (emphasis omitted).   Defendant "Bridgepoint's accounting practices made no distinction as to students with financial aid funding and those without—treating them all as equivalent in terms of collectability—while also failing to reconcile whether revenue recognition was still appropriate if or when a student dropped out of or became ineligible for the [FTG] [P]rogram …." *Id.*

"On July 25, 2014, [Defendant] Bridgepoint disclosed that it had received from the SEC a subpoena relating to certain of its accounting practices, including revenue recognition and receivables, and that the SEC had 'requested documents and detailed information for the time period January 1, 2009 to present.'" *Id.* at 40.

"On August 4, 2014, [Defendant] Bridgepoint issued a restatement of financial results for 2013 and the first three quarters thereof." *Id.*   Defendant Bridgepoint's 2013 10-K/A stated the following regarding the August 4, 2014 restatement:

> Our management has concluded that there are two material weaknesses in internal control over financial reporting, as we did not maintain effective controls over the selection and application of GAAP related to revenue recognition and restricted cash…. One control deficiency related to our failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by [Defendant Bridgepoint]'s institutions…. The other control deficiency related to our failure to maintain effective internal controls over the presentation of certain funds as restricted cash…. [O]ur management has determined that these control deficiencies constitute individual material weaknesses.

*Id.* at 41-42 (emphasis omitted).   Defendant Bridgepoint stated in its 2013 10-K/A that "[w]e plan to take additional measures to remediate the underlying causes of the material weaknesses." *Id.* at 42.   However, "those material weaknesses persisted for years." *Id.*

On March 10, 2015, Defendant

Bridgepoint stated in its 2014 10-K that it still had a "material weakness in internal control over financial reporting surrounding our failure to maintain effective internal controls over the accounting for revenue recognition"— specifically, that [Defendant] Bridgepoint "did not maintain effective controls surrounding the selection and application of GAAP related to revenue recognition as of December 31, 2014"….

*Id.*

"On August 10, 2015, [Defendant Bridgepoint] received Civil Investigative Demands from the Consumer Financial Protection Bureau [("CFPB")] 'related to the CFPB's investigation to determine whether for-profit post-secondary education companies or other unnamed persons have engaged in or are engaging in unlawful acts or practices related to the advertising, marketing or origination of private student loans.'" *Id*. at 44. On December 10, 2015, Defendant Bridgepoint received a

request for information from the Multi-Regional and Foreign School Participation Division of the [Department of Education Office of Federal Student Aid] for (i) advertising and marketing materials provided to prospective students regarding transferability of certain credit, (ii) documents produced in response to the CFPB's August 10, 2015 Civil Investigative Demand related to the CFPB's investigation to determine whether for-profit post-secondary education companies or other unnamed persons have engaged in or are engaging in unlawful acts or practices related to the advertising, marketing or origination of private student loans, (iii) certain documents produced in response to subpoenas and interrogatories issued by the California Attorney General and (iv) records created between 2009 and 2012 related to the disbursement of certain Title IV funds.

*Id*. (alteration in original).

On March 8, 2016 Defendant Bridgepoint filed its 2015 10-K (the date the Class Period begins). *See id*. at 49. Defendant Bridgepoint's 2015 10-K

contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), in which Defendants Clark and Royal certified that the 2015 10-K "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information

contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 49-50 (first and second alterations in original).

Defendant Bridgepoint's 2015 10-K stated, in relevant part,

Based on the remediation measures tested, which were found to be operating effectively, [Defendant Bridgepoint] concluded that the material weakness relating to the selection and application of GAAP related to restricted cash was remediated as of December 31, 2014.

*Id*. at 44. Defendant Bridgepoint's 2015 10-K further stated, in relevant part,

We are committed to remediating the control deficiencies that constitute the … remaining material weakness by implementing changes to our internal control over financial reporting.

*Id*. at 43. Defendant Bridgepoint's 2015 10-K "mentioned a new material weakness that was not mentioned in the 2014 10-K—specifically, that [Defendant Bridgepoint] 'also did not maintain effective controls to assess the reliability of system generated data used in the operation of certain revenue recognition controls.'" *Id*. at 45. Defendant Bridgepoint stated in its 2015 10-K that "[w]e plan to implement measures to remediate the underlying causes of the control deficiencies that gave rise to the material weakness." *Id*.

On March 24, 2016, Defendant Bridgepoint announced that it had dismissed PricewaterhouseCoopers, LLP ("PwC") and approved the appointment of Deloitte & Touche LLP ("Deloitte") as Defendant Bridgepoint's "independent registered public accounting firm for the fiscal year ending December 31, 2016 and the interim quarterly period beginning with the quarter ending March 31, 2016." *Id*. at 45-46.

"On May 18, 2016 … the SEC expanded its investigation of [Defendant] Bridgepoint to include [Defendant Bridgepoint]'s 'scholarship and institutional loan programs and any other extensions of credit made by [Defendant Bridgepoint] to students, and student enrollment and retention at [Defendant Bridgepoint]'s academic institutions' from as early as January 1, 2014." *Id*. at 46. "On July 12, 2016, [Defendant] Bridgepoint announced that the U.S. Department of Justice was conducting an 'investigation

concerning allegations that [Defendant Bridgepoint] may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act.'" *Id*. at 47.

On March 7, 2017, Defendant Bridgepoint filed its 2016 10-K. *See id*. at 50. Defendant Bridgepoint's 2016 10-K

> contained signed SOX certifications in which Defendants Clark and Royal certified that the 2016 10-K "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 52 (first and second alterations in original). Defendant Bridgepoint's 2016 10-K stated, in relevant part,

> We have implemented measures to remediate the control deficiencies that gave rise to the material weaknesses…. We believe the … measures have enabled us to remediate the control deficiencies that gave rise to the material weaknesses. We will continue to maintain appropriate focus on this critical accounting area going forward. We believe these measures have remediated the identified control deficiencies and strengthen internal control over financial reporting.

*Id*. at 47-48, 50-51 (emphasis omitted). Defendant Bridgepoint's 2016 10-K stated, in relevant part,

> [O]ur [CEO] and our [CFO] concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2016…. Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 …. Our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

*Id*. at 51-52.

On February 21, 2018, Defendant Bridgepoint filed its 2017 10-K. *See id*. at 53. Defendant Bridgepoint's 2017 10-K "contained statements substantively identical to the

statements in the 2016 10-K" regarding "the effectiveness of [Defendant] Bridgepoint's disclosure controls and procedures, as well as internal control over financial reporting ...." *Id*. at 53.   Defendant Bridgepoint's 2017 10-K "contained general and boilerplate representations concerning [Defendant] Bridgepoint's risk of error relating to its disclosure controls and procedures, as well as internal control over financial reporting, substantively identical to the statements in [Defendant Bridgepoint]'s 2016 10-K ...."  *Id*. at 53-54. Defendant Bridgepoint's 2017 10-K

> contained signed SOX certifications in which Defendants Clark and D'Amico certified that the 2017 10-K "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 54 (first and second alterations in original).

On March 13, 2018, Defendant Bridgepoint "issued a press release" announcing its "plans to separate from its academic institutions, Ashford University and University of the Rockies, and become an Online Program Management (OPM) company."  *Id*. at 36.

On May 1, 2018, Defendant Bridgepoint filed its quarterly report for the first quarter of 2018 ("2018 Q1 10-Q").  *See id*. at 54.  Defendant Bridgepoint's 2018 Q1 10-Q

> contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q1 10-Q "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [1Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. (first and second alterations in original).

On July 25, 2018, Defendant Bridgepoint filed its quarterly report for the second quarter of 2018 ("2018 Q2 10-Q").  *See id*.  Defendant Bridgepoint's 2018 Q2 10-Q

> contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q2 10-Q "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended"

and that "[t]he information contained in the [2Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 55 (first and second alterations in original).

On November 8, 2018, Defendant Bridgepoint filed its quarterly report for the third quarter of 2018 ("2018 Q3 10-Q"). *See id*. Defendant Bridgepoint's 2018 Q3 10-Q

contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q3 10-Q "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. (first and second alterations in original).

On March 7, 2019, Defendant Bridgepoint filed a Form 8-K. *See id*. at 56. Defendant Bridgepoint's Form 8-K stated, in relevant part,

On March 6, 2019, the Audit Committee of the Board of Directors … concluded that [Defendant Bridgepoint]'s previously issued unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2018 …, should no longer be relied upon because of errors. Additionally, [Defendant Bridgepoint]'s earnings and press releases and similar communications to the extent that they relate to our financial statements for the [three and nine months ended September 30, 2018] should no longer be relied upon.

Specifically, during the preparation of the 2018 annual consolidated financial statements, [Defendant Bridgepoint] determined that the process used for recording the revenue for the [FTG] [P]rogram portion of our students contracts and the related judgments and estimates were not designed with sufficient precision. As a result, [Defendant Bridgepoint] identified errors, relating to revenue, provision for bad debts, accounts receivable and deferred revenue, which resulted in the overstatement of revenue and expenses for the [three and nine months ended September 30, 2018]. The errors described above were material … and will be corrected in the restatement of our financial statements for the [three and nine months ended September 30, 2018]….

[Defendant Bridgepoint] has subsequently identified two material weaknesses in internal control over financial reporting related to 1) control design in the accounting for revenue related to the [FTG] [P]rogram and 2) operation of review controls over unusual or non-recurring and significant transactions.

Our management has re-evaluated its assessment of our disclosure controls and procedures and internal control over financial reporting as of September 30, 2018 and concluded that each was ineffective as of that date due to the existence of material weaknesses.

*Id*. at 57-58 (emphasis omitted). "On this news, [Defendant] Bridgepoint's stock price plummeted by $3.21 per share, or over 34%, to close at $6.22 per share on March 7, 2019, on unusually heavy trading volume." *Id*. at 58.

Defendant Bridgepoint's 2018 Q3 10-Q/A stated the following regarding the restatement:

For the three and nine months ended September 30, 2018, [Defendant Bridgepoint] determined that such financial statements had errors related to (i) revenue for the [FTG] [P]rogram portion of our student contracts which was misstated due to allowances that had not been properly determined and computational errors, which also resulted in misstatements in accounts receivable and its provision for bad debts, deferred revenue and student deposits, and the related income tax impact; (ii) classification error of $5.7 million between restricted cash and other long term-assets as of September 30, 2018 related to a long-term letter of credit issued as collateral for the build-to-suit lease, and (iii) a misstatement in the adjustment to beginning retained earnings as of January 1, 2018 as a result of the incorrect adoption of ASU 2014-09, Revenue from Contracts with Customers, or Accounting Standards Codification Topic 606 … as it relates to the [FTG] Program, resulting in a decrease of $2.2 million from the amount previously reported of $3.2 million to $1.0 million [sic], as restated.

*Id*. at 58-59 (emphasis omitted). Defendant Bridgepoint's 2018 Q3 10-Q/A reflects the following misstatements for the nine months ended September 30, 2018:

net income decreased by $5.8 million ($23.8M to $18.05M), revenue decreased $5 million ($353.7M to $348.7M), accounts receivable decreased by $4.7 million ($33.57M to $28.9M), and deferred revenue and student deposits (a liability account) increased by $4.5 million ($53.87M to $58.4M).

*Id*. at 59.

On March 12, 2019, Defendant Bridgepoint filed its 2018 10-K.  *See id*.  Defendant Bridgepoint's 2018 10-K

> told investors that other prior period financial statements (i.e., 2017, and 2016, and for 2015 and prior) also contained misstatements attributable to the same improper accounting "for the [FTG] [P]rogram portion of [its] student contracts," stating again that it was "due to allowances that had not been properly determined [as well as] computational errors … in accounts receivable and its provision for bad debts and deferred revenue and student deposits."

*Id*. (third, fourth, and fifth alteration in original).  Defendant Bridgepoint's 2018 10-K identified the following "material weakness" in Defendant Bridgepoint's internal controls over financial reporting as of December 31, 2018:

> [Its] control design in the accounting of the student contracts for the [FTG] [P]rogram whereby revenue was misstated due to allowances that had not been properly determined and contained computational errors, which also resulted in misstatements in accounts receivable and its provision for bad debts and deferred revenue and student deposits.

*Id*. at 60 (first alteration in original).  Defendant Bridgepoint's 2018 10-K "explained this material weakness, and that the restatement of its financial statements, resulted from management incorrectly applying ASC 606 upon adoption on January 1, 2018 'as it relates to the [FTG] [P]rogram, specifically the time period for which to recognize revenue in 2018 related to [FTG] students that became inactive.'"  *Id*. at 61 (emphasis omitted).  Defendant Bridgepoint stated in its 2018 10-K that "[w]e are committed to remediating the material weaknesses by implementing changes to our internal control over financial reporting."  *Id*.  These errors led to the following misstatements for 2017:

> net income decreased by $1.4 million ($10.5M to $$ [sic] 9.1M), revenue decreased $3.4 million ($478.4M to $475M), accounts receivable decreased by $2.8 million ($27M to $24.2M), and the liability account "deferred revenue and student deposits" increased by $2.8 million ($68M to $70.8M).

*Id.* at 59-60. "Following this filing, [Defendant] Bridgepoint's stock price fell once again, declining from $7.00 on March 12, 2019 at close to $6.90 at close on March 13, 2019." *Id.* at 60.

Defendant Bridgepoint's false and misleading statements during the Class Period include Defendant Bridgepoint's 2015 10-K, 2016 10-K, 2017 10-K, 2018 Q1 10-Q, 2018 Q2 10-Q, and 2018 Q3 10-Q. *See id.* at 49-56. "Defendants were reckless in designing and/or employing [Defendant Bridgepoint]'s processes for recording revenue, deferred revenue, accounts receivable, and bad debt expense for its FTG [P]rogram in a manner than violated GAAP, SEC regulations, and its own stated revenue recognition policy …." *Id.* at 55-56. Defendant "Bridgepoint failed to maintain effective internal controls over financial reporting …." *Id.* at 56. Defendant

> Bridgepoint made material accounting errors related to deferred revenue, accounts receivable, and its provision for bad debts in its financial statements during the Class Period—most significantly, [Defendant] Bridgepoint's financial statements for the first three quarters of 2018 overstated revenue by $5.06 million and overstated net income by $5.78 million—which violated GAAP, SEC regulations, and its own stated revenue recognition policy and thus rendered [Defendant] Bridgepoint's financial statements for the Class Period "misleading or inaccurate" under 17 C.F.R. § 210.4-01(a)(1).

*Id.*

"[E]rrors in [Defendant] Bridgepoint's Class Period financial statements appear to have emanated from its inability to report appropriate and 'precise' estimates in the allowance it created for students who withdrew, were terminated, dropped-out of the FTG [P]rogram, or could no longer pay for program costs that fell to them." *Id.* at 64. Defendant "Bridgepoint also apparently did not sufficiently track the students who were 'active' in this program, or whether its financial statements properly reflected this phenomenon." *Id.* "The foregoing caused or contributed to [Defendant Bridgepoint] failing to properly account for revenue, deferred revenue, accounts receivable, or bad debt expense, including significantly with respect to students enrolled in its FTG [P]rogram throughout the Class Period." *Id.* "[T]he identification of material weaknesses in internal controls for the year 2018 confirmed

1   that … [Defendant Bridgepoint] had ultimately failed to sufficiently remediated its
2   identified internal control deficiencies since as far back as 2013." *Id*. at 63.

3                              **CONTENTIONS OF THE PARTIES**

4        Defendant Bridgepoint contends that Plaintiff fails to allege facts demonstrating
5   scienter.  Defendant Bridgepoint contends that scienter requires more than a misapplication
6   of GAAP principles.  Defendant Bridgepoint asserts that the problems identified in the 2013
7   Restatement are different than the problems identified in the 2018 Restatement.  Defendants
8   Clark, Royal, and D'Amico contend that they did not engage in fraud by addressing the
9   problems identified in the 2013 Restatement and failing to anticipate future problems
10  identified in the 2018 Restatement.

11       Plaintiff contends that the Complaint sufficiently alleges facts demonstrating
12  scienter.  Plaintiff asserts that Defendant Bridgepoint disregarded GAAP requirements for
13  revenue recognition because the same revenue recognition problems underlying the 2013
14  Restatement resurfaced in the 2018 Restatement.   Plaintiff contends that the 2013
15  Restatement and acknowledgment of internal control problems were red flags that put
16  Defendants Clark, Royal, and D'Amico on notice of Defendant Bridgepoint's revenue
17  recognition problems.  Plaintiff asserts that Defendants Clark, Royal, and D'Amico were in
18  positions to recognize the significance of the red flags and investigate.

19                              **STANDARD OF REVIEW**

20       Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a
21  claim upon which relief can be granted …." Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil
22  Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain … a
23  short and plain statement of the claim showing that the pleader is entitled to relief …."
24  Fed. R. Civ. P. 8(a)(2).  "A district court's dismissal for failure to state a claim under
25  Federal Rule of Civil Procedure 12(b)(6) is proper if there is a lack of a cognizable legal
26  theory or the absence of sufficient facts alleged under a cognizable legal theory."
27  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (internal quotation
28  marks and citation omitted).  "All allegations of material fact are taken as true and

construed in the light most favorable to the nonmoving party." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (citation omitted).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)) (alteration in original).  When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations ...." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden St. Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted).  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

## DISCUSSION

### A. Violations of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (Count 1)

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5 states that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,

15

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a valid claim under Section 10(b) and SEC Rule 10b-5, a plaintiff must plead that: (1) defendants made a material misrepresentation or omission; (2) defendants acted with scienter; (3) there was a connection with the purchase or sale of a security; (4) plaintiffs relied on the alleged misrepresentation or omission; (5) plaintiffs suffered economic loss; and (6) the alleged misrepresentation or omission caused the loss from which plaintiffs seek to recover damages.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), which calls for exacting pleading requirements in § 10(b) and Rule 10b-5 actions.  *See* 15 U.S.C. § 78u-4.  The PSLRA states that

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  The PSLRA requires that

… in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

16

3:19-cv-00460-WQH-AHG

15 U.S.C. § 78u-4(b)(2)(A).  A PSLRA claim must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (emphasis in original) (internal quotation marks and citation omitted).  If the complaint does not contain such allegations, it must be dismissed.  *See* 15 U.S.C. § 78u-4(b)(3)(A).

"Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression.'" *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).  Plaintiffs must also show that defendants "engaged in 'knowing' or 'intentional' conduct or acted with 'deliberate recklessness.'" *Id*. (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)).  "In the securities context, 'an actor is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Id*. (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The Court of Appeals has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [the court must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991-92 (9th Cir. 2009)).

Unlike the court's typical analysis under a 12b(6) motion wherein all inferences must be construed in the light most favorable to the plaintiff, a motion to dismiss pursuant to the PSLRA requires that the court "take into account plausible opposing inferences." *Tellabs*,

551 U.S. at 323.   Specifically, in order to determine whether a complaint's scienter allegations are sufficient pursuant to the PSLRA, "a court … must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Id*. at 314.   "To qualify as 'strong' …, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. Additionally, the court "must consider the complaint in its entirety …." *Id*. at 322.   "The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23 (emphasis in original).

The Amended Complaint alleges facts showing that Defendant Bridgepoint recognized a "failure to maintain effective internal controls over the accounting for revenue recognition" in its 2013 10-K/A.  (ECF No. 19 at 41) (emphasis omitted).  "Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by [Defendant Bridgepoint]'s institutions." *Id*. (emphasis omitted). The Amended Complaint alleges that Defendant Bridgepoint "stated in its 2014 10-K that it still had a 'material weakness in internal control over financial reporting surrounding our failure to maintain effective internal controls over the accounting for revenue recognition' …." *Id*. at 42.  The Amended Complaint alleges that Defendant Bridgepoint stated in its 2015 10-K that it remained "committed to remediating the control deficiencies that constitute the … material weakness" identified in the 2013 10-K/A. *Id*. at 43.  The Amended Complaint alleges that Defendant Bridgepoint stated in its 2016 10-K that it had "remediate[d] the control deficiencies that gave rise to the material weakness[]" identified in the 2013 10-K/A. *Id*. at 48, 51 (emphasis omitted).

The Amended Complaint alleges that Defendant Bridgepoint's 2017 10-K "contained statements substantively identical to the statements in the 2016 10-K" regarding "the effectiveness of [Defendant] Bridgepoint's disclosure controls and procedures, as well as

internal control over financial reporting ….." *Id*. at 53.  The Amended Complaint alleges that Defendant Bridgepoint's 2017 10-K

> contained signed SOX certifications in which Defendants Clark and D'Amico certified that the 2017 10-K "fully complies with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 54 (first and second alterations in original).  The Amended Complaint alleges that Defendant Bridgepoint's 2018 Q1 10-Q, 2018 Q2 10-Q, and 2018 Q3 10-Q

> contained signed SOX certifications in which Defendants Clark and Royal certified that the 2018 Q1 10-Q[, 2018 Q2 10-Q, and 2018 Q3 10-Q] "fully compl[y] with the requirements of Section 13(a) or 15(b) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the [1Q18 10-Q, 2Q18 10-Q, and 3Q18 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [Defendant Bridgepoint]."

*Id*. at 54-55 (third alteration in original).

The Amended Complaint alleges facts showing that Defendant Bridgepoint recognized a new accounting problem in its March 7, 2019 Form 8-K.  *See id*. at 57. Specifically, "the process used for recording the revenue for the [FTG] [P]rogram portion of [Defendant Bridgepoint's] students contracts and the related judgments and estimates were not designed with sufficient precision." *Id*. (emphasis omitted).  The Amended Complaint alleges that Defendant Bridgepoint "told investors" in its 2018 10-K "that other prior period financial statements … also contained misstatements attributable to the same improper accounting "for the [FTG] [P]rogram portion of [its] student contracts …." *Id*. at 59 (fourth alteration in original).  The Amended Complaint alleges that Defendant Bridgepoint stated in its 2018 10-K that "[w]e are committed to remediating the material weaknesses by implementing changes to our internal control over financial reporting." *Id*.

3:19-cv-00460-WQH-AHG

"In general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco*, 552 F.3d at 1000. In addition, "[s]cienter requires more than a misapplication of accounting principles." *New Mexico*, 641 F.3d at 1098 (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 628 (9th Cir. 1994)). "The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (quoting *In re Software*, 50 F.3d at 628). "When assessing GAAP violations …, the violations should generally be more than 'minor or technical in nature' and 'constitute [ ] widespread and significant inflation' to contribute to a strong inference of scienter." *Id.* (quoting *In re Daou Systems, Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005)) (alteration in original). "While a violation of GAAP, standing alone, is not sufficient, allegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* (internal quotation marks and citation omitted).

The 2013 Restatement identified "two material weaknesses in internal control over financial reporting":

> One control deficiency related to [the] failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by [Defendant Bridgepoint]'s institutions…. The other control deficiency related to [the] failure to maintain effective internal controls over the presentation of certain funds as restricted cash.

(ECF No. 19 at 41). The 2018 Restatement identified "two material weaknesses in internal control over financial reporting related to 1) control design in the accounting for revenue related to the [FTG] [P]rogram and 2) operation of review controls over unusual or non-recurring and significant transactions." *Id.* at 57. More specifically, the first material weakness in the 2018 Restatement arose because "the process used for recording the

revenue for the [FTG] [P]rogram portion of [Defendant Bridgepoint's] students contracts and the related judgments and estimates were not designed with sufficient precision." *Id*. at 57 (emphasis omitted).  The accounting problems identified in the 2013 Restatement differed from the accounting problems identified in the 2018 Restatement.  The 2013 Restatement involved a "failure … to reassess collectibility, on a student-by-student basis" and "the presentation of certain funds as restricted cash" while the 2018 Restatement involved misstatements in "accounting for revenue related to the [FTG] [P]rogram" and "unusual or non-recurring and significant transactions."  *Id*. at 41, 57.

The "mere publication" of Defendant Bridgepoint's 2013 Restatement on August 4, 2014 and 2018 Restatement on March 7, 2019 "is not enough to create a strong inference of scienter."  *Zucco*, 552 F.3d at 1000.  Evidence of revenue misstatements, even those involving "misapplication of accounting principles", without more, are insufficient to create an inference of scienter.  *New Mexico*, 641 F.3d at 1098 (quoting *In re Software*, 50 F.3d at 628).

There are no facts alleged in the Amended Complaint which evidence accounting practices "so deficient" as to amount to "an egregious refusal to see the obvious[] or to investigate the doubtful …."  *New Mexico*, 641 F.3d at 1098 (quoting *In re Software*, 50 F.3d at 628).  The alleged facts in the Amended Complaint demonstrate consistent recognition of and response to internal control weaknesses set forth in detail in the public filings.   The Restatements and remediation measures demonstrate that Defendant Bridgepoint "review[ed] [and] check[ed] information that they had a duty to monitor …." *Id*. (internal quotation marks and citation omitted).  The Court concludes that Plaintiff fails to state a claim for violations of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 because Plaintiff fails to allege facts to support the requisite element of scienter. Plaintiff's first claim is dismissed without prejudice.

**B. Violation of § 20(a) of the Securities Exchange Act of 1934 (Count 2)**

Section 20(a) of the Securities and Exchange Act of 1934 states that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)). The Court concludes that Plaintiff fails to state a claim for violation of § 20(a) of the Securities Exchange Act of 1934 because Plaintiff fails to allege a requisite "primary violation of federal securities law …." *Id.* (citation omitted). Plaintiff's second claim is dismissed without prejudice.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss filed by Defendants Bridgepoint Education, Inc.; Andrew S. Clark; Kevin Royal; and Joseph L. D'Amico (ECF No. 22) is GRANTED. Plaintiff's Amended Complaint is DISMISSED without prejudice. Any motion for leave to file an amended pleading must be filed within 30 days of this Order.

Dated: June 15, 2020

Hon. William Q. Hayes
United States District Court